COMMONWEALTH *vs.* GREG WIGFALL
(and seven companion cases[1]).

No. 91-P-112.

Essex. November 14, 1991. - May 27, 1992.

Present: KASS, SMITH, & GREENBERG, JJ.

*Constitutional Law*, Search and seizure. *Search and Seizure*, Exigent circumstances, Probable cause. *Probable Cause.*

In a criminal case, the judge correctly allowed the defendants' motions to suppress evidence, where the judge's findings supported her conclusions that the police had sufficient information to procure an arrest warrant for one of the defendants, or a warrant to search the defendant's basement apartment, three hours before making a warrantless entry of the premises and that the Commonwealth failed to meet its burden of establishing the existence of exigent circumstances. [585-588]

INDICTMENTS found and returned in the Superior Court Department on May 30, 1990.

Pretrial motions to suppress evidence were heard by *Patti B. Saris*, J.

An application for an interlocutory appeal was allowed by *Neil L. Lynch*, J., in the Supreme Judicial Court for the county of Suffolk and the appeal was reported by him to the Appeals Court.

*Abbe L. Ross*, Assistant Attorney General, for the Commonwealth.

*Benjamin H. Keehn*, Committee for Public Counsel Services, for Robert Anderson.

*Charles W. Rankin* for Duke Wilson.

*Ronald Ian Segal*, for Greg Wigfall, was present but did not argue.

---

[1]One of the companion cases is against Greg Wigfall; the remaining six are against Duke Wilson, Robert Anderson, and Eugene Anderson.

GREENBERG, J. Each defendant was indicted on one count of trafficking in over 100 grams of cocaine (G. L. c. 94C, § 32E[b][3], as amended through St. 1988, c. 124) and one count of conspiracy (G. L. c. 94C, § 40) by an Essex County grand jury on May 30, 1990. The controlled substance in question was seized on May 21, 1990, during a warrantless entry of Wigfall's basement apartment at 18 Union Court, Lynn. After a hearing, a Superior Court judge allowed the defendants' motions to suppress the evidence. Pursuant to Mass.R.Crim.P. 15(b)(2), 378 Mass. 884 (1979), the Commonwealth applied to a single justice of the Supreme Judicial Court for leave to appeal from the suppression orders. The single justice granted the Commonwealth's application and transferred the case to this court. We affirm the suppression order.

When a trial judge has made specific factual findings in support of the allowance of a motion to suppress, "they will be accepted by an appellate court absent clear error." *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978). While a trial judge's ultimate legal conclusion is also entitled to substantial deference, we follow the precept that "such an ultimate legal conclusion . . . is a matter for review . . ., particularly where the conclusion is of constitutional dimensions." *Ibid.* Thus, a trial judge's ruling on a motion to suppress may be reversed only in those limited circumstances where the facts found are clearly erroneous or "where justice requires [that the appellate court] substitute its judgment for that of a trial judge at the final stage." *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980).

With that prologue, we summarize the judge's findings, supplemented .with additional undisputed information we have gleaned from the record. During the investigation of unlawful drug distribution in the city of Lynn, State Trooper Dennis L. Brooks, a member of the Attorney General's Narcotics Task Force, recruited a confidential informant, called "Blue," who agreed to assist Trooper Brooks in ferreting out drug dealers. Blue's involvement with the Task Force did not,

however, lead to any arrests, nor did she participate in any "controlled buys" prior to the events we next describe.

Blue told Trooper Brooks that the defendant Wigfall was dealing large amounts of cocaine from his basement apartment at 18 Union Court. Blue had met Wigfall on several occasions in the street and had visited his primitively outfitted apartment where she had observed cocaine and a set of scales. She had never purchased drugs from Wigfall. Blue offered to introduce Trooper Brooks to Wigfall, and to that end the pair devised a plan: Brooks would pose as Blue's brother who was considering buying large amounts of cocaine in New York but whom Blue had persuaded to contact Wigfall first.

Around noon on the day of the arrests, Blue and Brooks met Wigfall in his basement unit. No one else was present. Brooks told Wigfall he wanted to buy 1,000 grams of cocaine. After five or ten minutes of haggling, Wigfall agreed to sell 250 grams for $9,000. During the course of the negotiations, Wigfall disappeared behind a curtain, which apparently enclosed a combined kitchen and bedroom area, to make a telephone call. Upon his return, Wigfall surprised Brooks by announcing that, because his "connection" was only five minutes away, they could consummate the deal within fifteen minutes. Reacting quickly, Brooks said that he would need time to raise the money — and although he left Wigfall with the impression that he would return "[w]ithin the hour," Trooper Brooks gave Wigfall a pager number, which would allow the two to keep in touch.

Wigfall "beeped" Brooks at 1:00 P.M. and told him that things were "all set on this end" and "ready to go." Wigfall continued to beep Brooks every half hour thereafter, and Brooks, who was gathering officers from his office as well as from the Lynn and Boston police departments, fabricated reasons for his delay and assured Wigfall over the telephone that the deal was "still on." An arrest team of eleven or twelve plainclothes officers converged on the streets near Wigfall's apartment, and at approximately 4:00 P.M. Trooper Brooks entered the apartment alone. Inside, he was intro-

duced to the other three defendants. He held a brief conversation with them, examined "the product," and returned to his car, ostensibly to retrieve the money. Wigfall was ordered by the defendant Eugene Anderson, the apparent sachem of the group, to accompany Trooper Brooks. When he reached his automobile, Brooks gave a prearranged signal (indicating that he had either seen drugs in the apartment or now had them in his possession) — his fellow officers moved in, arrested Wigfall, and staged a mock arrest of Brooks himself. The commanding officer at the scene, Sergeant Quigley of the State police, conferred with Brooks, who confirmed the presence of cocaine in the apartment. Sergeant Quigley and other members of the backup team then approached the front door of the apartment, and, after hearing an exclamation ("What the fuck is going on out there?"), forced open the door without warning and, guns drawn, arrested the three other defendants. The seized cocaine was in plain view on a table.

In her memorandum allowing the motions to suppress, the motion judge relied primarily on the principle annunciated in *Commonwealth* v. *Forde*, 367 Mass. 798 (1975) (exigent circumstances do not excuse a warrantless entry where the exigency was reasonably foreseeable and where there was adequate time to obtain a warrant). The Commonwealth takes issue with the judge's conclusion that the task force members had sufficient information at 1:00 P.M. to procure either a warrant to arrest Wigfall inside his apartment or a warrant to search the premises for cocaine. The Commonwealth contends that the judge's reliance on *Forde* is misplaced because the officers did not acquire probable cause to search or arrest until 3:30 P.M.[2] and could have, at best, obtained an "anticipatory warrant" after the first beep at 1:00 P.M. — a practice

---

[2]In a conversation following a "beep" at approximately 3:30 P.M., Wigfall told Trooper Brooks that "everything [is] here waiting for you." The Commonwealth apparently did not make this specific contention below; instead, it argued that probable cause first arose when Trooper Brooks saw the cocaine just after 4:00 P.M. Although we are not obliged to consider this argument based on a new twist of the facts, see *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987), our view of the case obvi-

which the police are not required to follow. See *Commonwealth* v. *Cast*, 407 Mass. 891, 906 (1990).

We are not persuaded by these arguments. Probable cause to arrest Wigfall in his apartment arose when the police had gathered information "sufficient to warrant a prudent man in believing that [Wigfall] had committed or was committing an offense." *Commonwealth* v. *Pietrass*, 392 Mass. 892, 897-898 (1984), quoting from *Beck* v. *Ohio*, 379 U.S. 89, 91 (1964). We recognize that Blue was an unidentified and untested informant whose information standing alone cannot supply probable cause unless it "pass[es] muster under the two-pronged standard set forth in *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969)." *Commonwealth* v. *Cast*, 407 Mass. at 896. See also *Commonwealth* v. *Upton*, 394 Mass. 363, 370-377 (1985). Undeniably, Blue's information alone would not have allowed the police to clear those formidable hurdles.

It is our view, however, that a reasonable magistrate would have been justified in issuing a warrant to arrest Wigfall inside his apartment at 1:00 P.M, based on both the information Trooper Brooks had collected independently and the information supplied by Blue. It is well settled that "independent police observation of criminal activity [may] bridge[] the gap between [an] *Aguilar*-defective informant's tip and a finding of probable cause." *Commonwealth* v. *Saleh*, 396 Mass. 406, 411 (1985) (involving probable cause to search). See *Draper* v. *United States*, 358 U.S. 307, 313 (1959); *Commonwealth* v. *Avery*, 365 Mass. 59, 63-64 (1974); *Commonwealth* v. *Boswell*, 374 Mass. 263, 267-269 (1978) (all cases involving probable cause to arrest based upon police corroboration of informer's tips). Contrast *Commonwealth* v. *Stevens*, 362 Mass. 24, 27-28 (1972).

Here, Trooper Brooks's face-to-face negotiation with Wigfall for the sale of cocaine "established probable cause to believe that [Wigfall] was currently engaged . . . in the criminal activity of drug distribution," *Commonwealth* v.

---

ates the need for a distinction between the state of affairs at 3:30 P.M. and that at 4:00 P.M.

*Saleh*, 396 Mass. at 411, and also provided "some of the underlying circumstances from which [a magistrate could] conclude[] that the informant was 'credible' or [her] information 'reliable' (the veracity test)." *Commonwealth* v. *Upton*, 394 Mass. at 375. Contrast *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596, 597, 599 (1991). We think that this information, when taken in conjunction with the sum total of (1) Blue's report of the scales and cocaine; (2) Wigfall's apparent desire, at noon, to wrap up the deal quickly; (3) the reported close proximity of Wigfall's "source" to his apartment; (4) the impression Brooks left with Wigfall that he would return by 1:00 P.M. and the confirmation call, at 1:00 P.M., that "everything was set"; and (5) the judge's specific finding that "no place other than 18 Union Court was ever mentioned" as a location where the deal would occur, was more than adequate for the police to establish probable cause to arrest Wigfall inside the apartment at 1:00 P.M. The police had acquired considerably more than a "belief that [Wigfall] would commit a crime *in the future.*" *United States* v. *Jenkins*, 876 F.2d 1085, 1089 (2d Cir. 1989). After the first "beep," "the tip had been corroborated in vital particulars," *Commonwealth* v. *Boswell*, 374 Mass. at 268, and the crime was afoot.

Finally, the judge made a specific finding that it was reasonably foreseeable at 1:00 P.M. that the police would have to enter Wigfall's apartment either to arrest him or to search it for drugs. There was, therefore, sufficient information and time to obtain a warrant to arrest Wigfall inside his apartment prior to the 4:00 P.M. "exigency." See *Commonwealth* v. *Forde*, 367 Mass. at 806.[3] Contrast *Commonwealth* v. *Lee*, *ante* 85, 88 (1992). Since the judge found that the police did not provide a justifiable excuse why it was impracticable for them to obtain a warrant during the three afternoon hours

---

[3]While we acknowledge that the police in the *Forde* case apparently had sufficient information to establish probable cause one week prior to the warrantless entry, 367 Mass. at 801, the event or events which gave rise to the purported exigent circumstances there, as here, similarly occurred three hours before the foreseeable, warrantless entry. *Id.* at 802.

that separated the 1:00 P.M. conversation and the foreseeable entry,[4] we conclude that the Commonwealth has failed to meet its "burden of establishing the existence of exigent circumstances." *Commonwealth* v. *Hamilton*, 24 Mass. App. Ct. 290, 293 (1987). See *United States* v. *Beltran*, 917 F.2d 641, 642-644 (1st Cir. 1990) (failure to obtain a warrant during the three hours preceding a warrantless entry, when probable cause existed, precluded government from claiming exigent circumstances exception). Compare and contrast *Commonwealth* v. *Minh Ngo*, 14 Mass. App. Ct. 339, 341-342 (1982) (exigent circumstances existed because it was impracticable to obtain warrant where DEA agent had only two hours to assemble surveillance team, and location to be searched was one of four possible motor vehicles), with *United States* v. *Curzi*, 867 F.2d 36, 43 (1st Cir. 1989) (failure to obtain warrant when there were two hours to do so prevented a finding of exigent circumstances).[5]

*Orders affirmed.*

---

[4]The judge also found that Trooper Brooks was aware of the Lynn District Court's location and that the courthouse was only a short distance away from Wigfall's apartment.

[5]Because we conclude that there was no authority to enter the apartment — given the failure to secure an arrest warrant and the failure to show exigent circumstances — we need not decide whether the information possessed by the police at 1:00 P.M. was sufficient to supply probable cause to search the apartment. In addition, in affirming the allowance of the defendants' motions to suppress, we do not need to address whether the "no knock entry" also justified suppressing the evidence found at Wigfall's apartment.