COMMONWEALTH *vs.* BONNIE DiTORO.

No. 99-P-1010.

Middlesex. February 1, 2001. - March 22, 2001.

Present: ARMSTRONG, C.J., PERRETTA, & MASON, JJ.

*Search and Seizure,* Exigent circumstances, Probable cause, Warrant. *Constitutional Law,* Search and seizure, Probable cause. *Probable Cause. Practice, Criminal,* Required finding. *Joint Enterprise. Controlled Substances. Evidence,* Exculpatory, Declaration against interest.

Both probable cause and exigent circumstances supported police officers' warrantless entry on residential premises to effectuate arrests, in circumstances in which an undercover agent was unexpectedly presented with the prospect of an immediate sale to him of a large quantity of cocaine [195-197], nor was a warrant required for police officers' subsequent examination of the opened black handbag in which the cocaine had been carried or the white plastic bag containing the cocaine itself, in which the defendant had no expectation of privacy [197].

Evidence at the trial of an indictment for trafficking in over 200 grams of cocaine warranted the defendant's conviction on the theory that she was a joint venturer. [198]

At the trial of an indictment for trafficking in cocaine on a theory of joint venture, statements of the defendant's coventurers to the effect that the defendant had nothing to do with the drug deal were not clearly corroborated so as to be admissible in evidence. [198-200]

INDICTMENT found and returned in the Superior Court Department on July 31, 1996.

A pretrial motion to suppress evidence was heard by *Hiller B. Zobel,* J., and the case was tried before him.

*Jonathan Shapiro* for the defendant.

*Susanne Levsen Reardon,* Special Assistant Attorney General, for the Commonwealth.

MASON, J. After a jury trial in the Superior Court, Bonnie Di-Toro was convicted of trafficking in cocaine in an amount over 200 grams. See G. L. c. 94C, § 32E(*b*)(4). On appeal she complains that the court erred in (1) failing to suppress certain

evidence; (2) failing to direct a required finding of not guilty; and (3) excluding from evidence certain allegedly exculpatory hearsay statements. We affirm the conviction.

*Suppression hearing.* We summarize the facts as found by the motion judge (who was also the trial judge), supplemented by uncontradicted testimony admitted at the suppression hearing. See, e.g., *Commonwealth* v. *Santiago*, 410 Mass. 737, 738 n.2 (1991).

In May of 1996, the Massachusetts State police learned of counterfeiting activity in Billerica. Coordinating with agents of the United States Secret Service, the State police began an investigation. State Trooper Raymond Auld thereafter obtained information giving him reason to believe that he could acquire counterfeit United States currency at a certain private home in Billerica (premises). Kimberly Cooper, Cooper's minor son, and Cooper's boyfriend, David Clune, resided at the premises.

On May 21, 1996, Auld, working undercover, went to the premises intending to obtain counterfeit currency. There he met Cooper, who invited him inside. Once inside, Cooper displayed and explained to Auld the machinery, materials, and processes used to produce the counterfeit currency. Cooper also mentioned that the copier used to make the counterfeit currency was not then working. At that point, Auld, a seasoned undercover narcotics officer, suggested that he could produce a skilled technician who would repair the copier in exchange for cocaine. Cooper responded that her boyfriend, Clune, could get the cocaine but that Clune normally dealt only in large quantities. Auld replied that he also was interested in large quantities and asked Cooper to inquire about prices. Cooper agreed to inquire. Prior to this meeting, Auld's investigation had focused solely on counterfeiting. As a result of Auld's conversation with Cooper, however, the investigative focus turned toward potential drug law violations.

On May 22, 1996, Auld, using a telephone number supplied by Cooper, spoke with both Cooper and Clune. In the course of this conversation, Auld agreed to purchase a kilogram of cocaine for $22,000, with delivery to take place at approximately 1:00 P.M. the next day.

At about 12:45 P.M. on May 23, Auld again telephoned the

premises and told Cooper and Clune that he was en route and that he had the $22,000. Cooper and Clune, however, told Auld that "the people weren't there yet with the drugs." Auld told Cooper and Clune that he would go to the nearby 99 Restaurant to wait. Cooper and Clune agreed. After Auld and his partner, State police Sergeant Thomas Greeley, arrived at the 99 Restaurant, Cooper and Clune unexpectedly showed up and joined Auld and Greeley. Clune told Auld at that time that the "people delivering the drugs" were "all over the place" and that delivery could not be accomplished until 3:30 or 4:00 that afternoon. Clune then borrowed Auld's cellular telephone and spoke to an unidentified person.[1] Auld said that he did not want to wait any longer and suggested they try again the next day.

On May 24, Auld telephoned Cooper and Clune and was told that delivery of the drugs could take place at 1:00 or 1:30 P.M. Auld, however, said he needed a little more time, and they agreed that delivery would take place at the premises at about 3:00 P.M.

Auld and Greeley arrived at the premises at about 3:15 P.M. in an unmarked police car. Neither Clune nor the drugs were there, but Cooper was present. At Cooper's invitation, Auld went inside the house while Greeley remained in the car with the money. A large number of State police, Secret Service agents, and Billerica officers were in the area ready to provide assistance. Once inside, Auld became restless and told Cooper that he would leave unless the drugs arrived soon. Cooper then made a few telephone calls purportedly to the persons bringing the cocaine. At about 4:30 P.M., Cooper and Auld went outside to await the arrival of the drugs.

Almost immediately, two people, DiToro and her boyfriend, Donald Hall, arrived in a rented car. DiToro was driving. Auld had not met Hall or DiToro previously, nor had he known of either's involvement. Hall and DiToro got out of the car and approached Cooper and Auld. Hall was carrying a black leather bag. Cooper introduced Hall and DiToro to Auld and suggested that they all go back into the house, which they did. Greeley

---

[1]The police subsequently determined from billing records that the call was made to a cellular telephone registered to the defendant.

again remained outside in the unmarked police car with the money.

Inside the house, Hall and Auld went into the kitchen. Cooper and DiToro remained behind in the living room, but they could observe Hall and Auld in the kitchen, which was open and only about fifteen feet away. Hall placed the black bag on the kitchen counter, and opened it while Auld was standing next to him. Auld was able to see into the black bag at this time and noticed that it contained a white plastic bag with some red lettering on its side, as well as some additional articles of the type typically found in a woman's purse or handbag. Hall removed the white plastic bag and opened it, revealing a quantity of white powder and "chunks" or "rocks" that Auld believed from his experience as a narcotics investigator were cocaine.

After inspecting the contents of the white bag, Auld complained about the quality of the drugs but agreed to make the purchase. He went outside, told Greeley that the drugs were in the house, and asked him to call the other officers who were waiting to provide assistance to come in and secure the arrest. Auld then took the money, and returned inside where Hall, Cooper, and DiToro were waiting. As Hall was counting the money, Greeley entered the premises through the open front door and sat down in the living room.

Less than one minute later, numerous police officers entered the premises, identified themselves, and arrested Cooper, Di-Toro, Hall, Greeley, and Auld.[2] The police also made a search to secure the premises, seized both the white plastic bag and the black leather bag on the kitchen counter, and frisked the defendants. DiToro had a small quantity of cocaine on her person. Auld, DiToro, and Hall were taken to the police station for booking. Greeley and other police officers remained behind and took control of the crime scene. Cooper was kept in the premises until arrangements could be made for her son's father to come and care for him, and then she also was taken to the police station.

While awaiting a search warrant, the police opened the white bag and field tested its contents, which they determined to be

---

[2]Greeley and Auld were arrested to maintain the appearance that they were suspects.

cocaine. They also opened the black bag and found that it contained DiToro's photo identification, a credit card in Di-Toro's name, and cashiers' checks and receipts for cashiers' checks in DiToro's name.[3] Later that evening, Auld returned to the premises with a search warrant for the entire premises, and the police thereafter seized a color copier, counterfeit currency, and various other items relating to the counterfeiting enterprise.[4]

1. *Suppression issues.* The judge denied the suppression motion, reasoning that the Commonwealth had sustained its burden of demonstrating the presence of the exigent circumstances necessary to justify the warrantless entry of the premises for purposes of making the arrests. Further, the judge held that the subsequent warrantless search of the bags did not render their contents inadmissible because the police would have inevitably discovered those contents if they had left the premises and obtained a warrant prior to opening the bags. See *Commonwealth* v. *Sbordone*, 424 Mass. 802, 810 (1997). DiToro contends that there were no exigent circumstances that justified the initial warrantless entry of Cooper's home, and even if there were, the inevitable discovery doctrine cannot be relied on to excuse the subsequent warrantless search of the bags since such a result would render the warrant requirement meaningless. See *Commonwealth* v. *Benoit*, 382 Mass. 210, 217-219 (1981); *Commonwealth* v. *Wigfall*, 32 Mass. App. Ct. 582 (1992).

We begin with the familiar rule that "warrantless entries are per se unreasonable unless they fall within one of the few narrowly drawn exceptions to the Fourth Amendment warrant requirements." *Commonwealth* v. *Amaral*, 16 Mass. App. Ct. 230, 233 (1983). Probable cause must be coupled with exigent circumstances to justify a warrantless police intrusion into the home. *Commonwealth* v. *Forde*, 367 Mass. 798, 800 (1975). The question whether exigent circumstances exist depends upon an evaluation of all the circumstances as they appear to the police at the time of the entry. See *Commonwealth* v. *Hall*, 366 Mass. 790, 801-803 (1975).

---

[3]The police also searched the car in which Hall and DiToro arrived. The judge determined that this warrantless search was unjustified and suppressed the evidence thereby obtained.

[4]Prior to trial, Cooper and Clune pleaded guilty to counterfeiting and drug charges, and Hall pleaded guilty to drug charges.

In the present case, we agree with the judge's conclusion that, when Auld and Greeley saw Hall emerging from the car with the black bag containing cocaine on the afternoon of May 24, and Cooper suggested that they enter the premises, both probable cause and exigent circumstances existed justifying an entry of the premises without a warrant. See *Commonwealth* v. *Collazo*, 34 Mass. App. Ct. 79, 84 (1993); *Commonwealth* v. *Lopez*, 38 Mass. App. Ct. 748, 749 (1995). We also agree with the judge's conclusion that, prior to that time, neither Auld nor Greeley had probable cause to believe that the sale would take place in or about the premises, or at any particular time. Earlier in the week, Cooper and Clune had appeared to be unable to consummate a deal, specifically telling Auld that their "people" were "all over the place." Cooper and Clune postponed the sale, failed to appear when scheduled, and appeared unexpectedly when not scheduled. Auld, therefore, could not be confident that the deal would take place at any particular time or in any particular place.

In contrast, in *Commonwealth* v. *Wigfall*, *supra*, relied on by DiToro, an undercover officer had advance notice that the defendant was prepared to sell him narcotics from the defendant's apartment at a time chosen by the officer. More specifically, the officer had been informed by a confidential informant that the defendant was dealing in large amounts of cocaine from his basement apartment and that the informant had been in the apartment and had observed cocaine and a set of scales. The officer then met with the defendant in his apartment and the defendant told the officer that he was prepared to proceed immediately with a sale of 250 grams of cocaine. While the officer put the defendant off by stating that he needed time to raise the necessary money, the defendant subsequently "beeped" the officer several times over a three-hour period to let him know that he was ready to proceed. There was, in short, substantial reason to believe that the transaction would take place within the defendant's apartment whenever the officer indicated that he was ready. The situation was far different here.

Because of the existence of exigent circumstances, the necessity for the police to obtain a warrant for their initial entry of Cooper's home and for the arrests of Cooper, Hall, and DiToro

was excused. They also did not need a warrant for their subsequent examination of the contents of both the black bag and the white bag that had been left on the kitchen counter. DiToro's argument to the contrary overlooks the undisputed evidence in the record that, shortly prior to the arrests, Hall had readily opened DiToro's black bag and displayed its contents to Auld. Hall had likewise opened the white cocaine bag and displayed its contents to Auld. In these circumstances, neither Hall nor DiToro had any legitimate expectation of privacy with respect to the contents of those bags when the police subsequently reopened them. Contrast *Commonwealth* v. *Straw*, 422 Mass. 756, 759 (1996) (holding that warrant was required where police opened locked briefcase which defendant had thrown from second story window of his home at time of arrest). Hence, no search requiring a warrant occurred. See *United States* v. *Jacobsen*, 466 U.S. 109, 119-120 (1984) (agent's visual inspection of contents of bag infringed no legitimate expectation of privacy and was not a search within meaning of Fourteenth Amendment where contents of bag had been freely disclosed to agent); *United States* v. *Cardona-Rivera*, 904 F.2d 1149, 1156 (7th Cir. 1990) ("Once [the defendant] admitted that his package contained a contraband substance, no lawful interest of his could be invaded by the officers' opening the packages, whether on the spot or later in their office"); *United States* v. *Corral*, 970 F.2d 719, 725-726 (10th Cir. 1992) ("where the police have already seen the contents of a seized container prior to conducting the search, there is no significant additional invasion of privacy involved in searching the container"). Cf. *Lopez, supra* at 750 (where police officer making controlled buy of narcotics leaves premises to obtain reinforcements, there has been no "additional intrusion on the defendant's expectations of privacy" to give rise to warrant requirement).

Our conclusion that a search warrant was not required makes it unnecessary for us to address the judge's reliance on the doctrine of inevitable discovery. We find no error in his denial of the motion to suppress the contents of the bags. See *Commonwealth* v. *Cast*, 407 Mass. 891, 897 (1990) (provided that correct or preferred basis for affirmance is supported by record and findings, appellate court may affirm on grounds not relied upon by motion judge).

2. *Required finding of not guilty.* The Commonwealth proceeded against DiToro on a joint venture theory. The Commonwealth could establish liability on this basis by proving beyond a reasonable doubt that DiToro was present at the scene of the crime with knowledge that the other defendants intended to commit the crime or with intent to commit the crime and, by agreement, was willing and available to help the defendants if necessary. See, e.g., *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983); *Commonwealth* v. *Springer*, 49 Mass. App. Ct. 469, 473 (2000).

Viewed in the light most favorable to the Commonwealth, see, e.g., *Commonwealth* v. *Harris*, 47 Mass. App. Ct. 481, 489 (1999), the evidence showed that (1) when arranging the deal Cooper called DiToro's cell phone; (2) DiToro's cell phone records included several calls to the premises between 12:03 P.M. and 2:16 P.M. on the day of the sale; (3) DiToro drove Hall to the premises at the time set for the deal; (4) Hall was carrying DiToro's handbag; (5) DiToro's handbag was used to carry the cocaine; (6) DiToro was present during the transaction and observed the details; (7) DiToro did not exhibit any "surprise" or "shock" when the cocaine was removed from her handbag and placed in full view of the persons in the premises; and (8) DiToro had a small amount of cocaine on her person when arrested. The motion was properly denied.

3. *Exculpatory hearsay evidence.* DiToro's final argument is that the trial judge erred in excluding certain exculpatory statements made by Hall and Cooper to the effect that DiToro had nothing to do with the drug deal. These statements allegedly were made spontaneously and independently by Hall and Cooper to a police officer at some unspecified time after the arrests. The trial judge excluded these statements on the ground that they were not sufficiently against Hall's and Cooper's penal interest to be admissible hearsay.

To be admitted as a statement against penal interest, three tests must be met: "[1] [T]he declarant's testimony must be unavailable; [2] the statement must so far tend to subject the declarant to criminal liability 'that a reasonable man in his position would not have made the statement unless he believed it to be true'; and [3] the statement, if offered to exculpate the ac-

cused, must be corroborated by circumstances clearly indicating its trustworthiness." *Commonwealth* v. *Drew*, 397 Mass. 65, 73 (1986), quoting from *United States* v. *Thomas*, 571 F.2d 285, 288 (5th Cir. 1978). See *Commonwealth* v. *Galloway*, 404 Mass. 204, 207-208 (1989).

We do not consider whether the statements were sufficiently against Hall's and Cooper's penal interest because we conclude that the statements lacked sufficient corroboration for admissibility. DiToro made no showing that Cooper had any basis to know whether DiToro was or was not involved in the drug deal. Although Hall presumably had sufficient personal knowledge to make the statement as alleged, his statement was entirely vague and included no details corroborating its assertion. He also had a relationship with DiToro and thus had an obvious motive to fabricate his statement. See *Commonwealth* v. *Drew, supra* at 77 ("The lack of detail about the crime, and the lack of factual details as to the involvement of the declarant in the crime also detract from the credibility of the statement"); *Commonwealth* v. *Piper*, 426 Mass. 8, 11 (1997) (statement by boyfriend of accused that accused was not involved in crime was properly excluded where he had motive to endear himself to accused and statement lacked any corroborating details).

Moreover, as summarized above, there was substantial evidence showing that DiToro was an active participant in the cocaine sale leading to her arrest. Although DiToro produced some evidence, none of it remotely touched upon or illuminated DiToro's arrangements with Hall which led to her presence at the premises or the presence of the cocaine in her bag.[5] Because

[5]DiToro called as a witness her mother, who testified that DiToro had planned to spend the weekend of May 24 at a gambling resort in Connecticut. DiToro also called as a witness an employee of a motorcycle repair facility who testified that he was called to respond to a motorcycle accident in the area of route 495 in Northborough some time after 2:00 P.M. on May 24. The employee further testified that, when he arrived at the scene, he found DiToro with a damaged motorcycle on the side of the southbound lane, and then observed her get into a white car being driven by an unidentified man in the northbound lane.

the offered statements were not "clearly corroborated," *Commonwealth* v. *Drew*, 397 Mass. at 78, they were not admissible.

*Judgment affirmed.*