COMMONWEALTH *VS.* ALEX MEJIA.

No. 03-P-1178.

Suffolk. November 9, 2004. - August 11, 2005.

Present: PERRETTA, GRASSO, & MILLS, JJ.

*Firearms. Evidence,* Firearm. *Electronic Surveillance. Search and Seizure,* Protective sweep. *Practice, Criminal,* Voluntariness of statement.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence of taped messages obtained by electronic surveillance, where the messages could not have prejudiced the defendant on the charge of unlawful possession of a firearm [242-245]; likewise, evidence implicating the defendant in the crime charged, which evidence the police derived, without a warrant, from the activation of the call identification function on a certain cellular telephone, was lawfully obtained, where the "organized crime" exception to the Massachusetts wiretap statute, G. L. c. 272, § 99, applied in that the police had the requisite reasonable suspicion that electronic interception would disclose or lead to evidence of a kidnapping in connection with organized crime [243-245].

A Superior Court judge properly denied the criminal defendant's motion to suppress evidence of a firearm that a police officer discovered upon flipping a mattress off its box springs in the apartment of one of the defendant's associates (in which the defendant did not reside), where, even assuming the defendant had a reasonable expectation of privacy in the apartment, the officer's actions did not exceed the scope of a permissible protective sweep of the apartment. [246-247]

This court declined to disturb the trial judge's factual findings concerning a criminal defendant's statements to the police, made as part of the judge's denial of the defendant's motion to suppress those statements, where the factual findings were supported by substantial evidence. [247-248]

The evidence at the trial of an indictment charging the defendant with unlawful possession of a firearm was sufficient to convict. [248-249]

INDICTMENT found and returned in the Superior Court Department on August 19, 1999.

Pretrial motions to suppress evidence were heard by *Barbara J. Rouse,* J., and the case was tried before *Elizabeth B. Donovan,* J.

*Robert D. Dimler* for the defendant.

*Dean A. Mazzone*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. Convicted of unlawful possession of a firearm, the defendant complains on appeal about the denials of his motions to suppress (1) evidence obtained by electronic surveillance, (2) the firearm, and (3) his statements to the police. He also complains about the sufficiency of the evidence. He claims that the use of a "trap and trace" device without a warrant violated G. L. c. 272, § 99, that the firearm was seized in the course of a warrantless search that exceeded the scope of a permissible protective sweep, and that he was intoxicated and not fully informed at the time of his waiver of his Miranda rights and statements to the police. We affirm the judgment.[1]

1. *The evidence.* Based on the evidence introduced at the suppression hearing, the judge found the following facts, which we supplement to a minimal extent with undisputed background from the transcripts of the evidentiary hearing. See *Commonwealth* v. *Sweezey*, 50 Mass. App. Ct. 48, 49 (2000). On the night of April 22, 1999, at about 10:30 P.M., Huber Gonzalez was kidnapped outside his house in Revere. John Benitez, a family friend, soon began receiving voice-mail messages on his pager. These messages, shown to have been made by the kidnappers, advised that Gonzalez had been kidnapped and "would not be seen alive again" unless the Gonzalez family came forward with $20,000. After their initial reaction to the messages, Benitez and members of the Gonzalez family attempted to determine the authenticity of the threat and went to the Revere police station. There they spoke with Detective Sergeant Carl Borgioli who, in turn, contacted the Federal Bureau of Investigation (FBI).

As a result of Borgioli's call, FBI agents were assigned to the investigation and proceeded to the Revere police station where, along with local law enforcement officials, they spoke with Benitez. Benitez explained to the Federal and State law enforcement officials, hereafter collectively referred to as the police, that he was the person who had been contacted by the kidnap-

---

[1] The defendant was found not guilty on indictments charging him with armed kidnapping with intent to extort and assault by means of a dangerous weapon.

pers through the use of his pager and Gonzalez's cellular telephone, which was in his possession.

At that time, now April 23, 1999, Benitez signed a consent form authorizing the police to record any conversations to which he was a party. The investigatory methodology was established: when Benitez would receive a voice-mail message on his pager, the police would call the voice-mail system from a telephone at the Revere police station and record the voice-mail message left by the kidnappers. That same day, April 23, 1999, at about 1:00 P.M., FBI agents obtained an order from a Federal judge authorizing Cellular One, the service provider for Gonzalez's cellular telephone in Benitez's possession, either to install a mechanical "trap and trace" device[2] on Gonzalez's cellular telephone, which the kidnappers were calling, or to activate the "call identification" ("caller ID") function of the cellular telephone. Either option provided by the order allowed Cellular One to ascertain the telephone number from which a call was being placed to Gonzalez's cellular telephone.

In the early evening hours of that same day, April 23, Benitez received a voice-mail message on his pager instructing him to go to the Copley Square area of Boston with both the demanded money and Gonzalez's cellular telephone. Benitez drove to the designated area with an FBI agent hiding in the back seat of his car and other police officers following closely behind. After several unsuccessful attempts by the kidnappers to coordinate a location at which Benitez could drop off the money, they called Gonzalez's cellular telephone. Benitez answered the call and demanded to speak with Gonzalez so that he could verify that he was still alive. Gonzalez was allowed to speak briefly with Benitez. While speaking with Gonzalez, Benitez was able to surreptitiously alert the police officers of his speaking with Gonzalez. The police immediately contacted Cellular One.

---

[2]A "trap and trace" device records the telephone numbers of the incoming or attempted incoming calls to a telephone number under surveillance. See, e.g., *District Attorney for the Plymouth Dist.* v. *New England Tel. & Tel. Co.*, 379 Mass. 586, 587 (1980). Although evidence on this point was introduced at trial, we relate it for the sole purpose of explaining the scope of the Federal judge's order and not for the purpose of analyzing the judge's rulings on the defendant's motions to suppress. See *Commonwealth* v. *Deramo*, 436 Mass. 40, 43 (2002) (appellate court may not rely on facts developed at trial in reviewing ruling on suppression motion).

Exercising the option provided by the Federal judge's order, Cellular One elected to activate the "caller ID" function in order to ascertain the number from which the kidnappers' call had originated. With that information and the use of an FBI database, the police ascertained the address from which the call by the kidnappers to Benitez had been made: 62 Clare Avenue in the Roslindale section of Boston.

Converging at 62 Clare Avenue, the police identified themselves to the landlady, who allowed them into the back hallway just outside the door to the first-floor apartment. Upon entering the hallway, the police heard glass shatter and saw several individuals running from the premises. Some of the police officers gave chase and were able to apprehend one individual, Dennis James.[3] Meanwhile, other officers received a Boston police radio transmission that shots had been fired. The officers responded by forcing their way into the apartment with their weapons drawn. Special Agent Travaglia found Gonzalez in one of the bedrooms. He was covered with tape and had a hood over his head and a ski mask rolled halfway up his face. Meanwhile, Special Agent Cacace was conducting a sweep of the apartment to determine whether any of the kidnappers had remained in the apartment. He went into one bedroom and flipped a mattress off the bed and discovered a loaded nine millimeter handgun.

To meet its burden of proof at trial on the indictment charging the defendant with unlawful possession of a firearm, the Commonwealth presented evidence that tracked the evidence presented at the evidentiary hearing on the motions to suppress. In addition to that evidence, the Commonwealth also presented proof of the following facts.

On the night of his abduction, Gonzalez was standing in his driveway when a man approached him, put a handgun to his head, and pushed him into a van or pickup truck. His head was then covered, and he was ordered to contact his family and inform them of a ransom demand. In complying with this

---

[3]Later that evening and the next day, James consented to the search of the apartment (which turned out to be his), waived his Miranda rights, and told the officers that Carmello, David, Rick, and Alex (the defendant) were involved in the kidnapping with him.

demand, Gonzalez provided the kidnappers with Benitez's pager number. On the night of his rescue and James's arrest, Gonzalez identified the vehicle parked in James's driveway as being the one in which he had been abducted.

Acting on information provided by James after his arrest, the police apprehended the defendant. Although the defendant agreed to speak with the police, he denied any involvement in Gonzalez's kidnapping. However, he did state that he was present at 62 Clare Avenue on April 23, that a number of other people were also present, including a man named Carmello, and that he saw a man bound and lying on the floor of the bathroom. The defendant also told the police that Carmello had a silver or chrome-plated handgun, which he (the defendant) had held, and that the police would find his fingerprints on the recovered gun.[4]

2. *The motions to suppress.* As noted at the outset, the defendant claims error in the denials of his three motions to suppress. We take them up in the order that the challenged evidence was obtained.

a. *The evidence obtained by electronic surveillance.* The surveillance in question consisted of two types: (1) the tape recordings made of messages left by the kidnappers on John Benitez's pager's voice-mail system; and (2) the information obtained by Cellular One identifying the telephone number from which calls were being placed to Benitez on Gonzalez's cellular telephone. The defendant did not own or possess any of the telephones or the pager system involved in the electronic surveillance.

(i) *The taped messages.* Even were we to assume that the defendant had an expectation of privacy in these recorded conversations, see *Commonwealth* v. *Eason*, 427 Mass. 595, 599-601 (1998), we would not conclude that any error in the denial of his motion on this score would require reversal of his conviction. The content of the recorded messages left on Benitez's pager (that Gonzalez had been kidnapped and that the kidnappers were demanding money for his safe return) could not have prejudiced the defendant on the sole charge of which he was convicted, that is, unlawful possession of a firearm. The

---

[4]No fingerprints were discovered on the handgun.

police learned of Gonzalez's kidnapping from his family and Benitez rather than from any recorded messages, the defendant was not a party to any of the recorded messages,[5] and he was acquitted of the charges relating to the kidnapping. See note 1, *supra.*

(ii) *Activation of the "caller ID" function.* As previously related, Cellular One was given authorization either to install a mechanical "trap and trace" device (see note 2, *supra*) or to activate the "caller ID" function on Gonzalez's cellular telephone. It was Cellular One's election to activate the "caller ID" function that led the police to 62 Clare Avenue, the discovery of the firearm, and the arrest of James, who, in turn, implicated the defendant. For purposes of decision, we will assume without deciding that activation of the "caller ID" feature of Gonzalez's cellular telephone is the functional equivalent of a "trap and trace" device requiring scrutiny under G. L. c. 272, § 99, the Massachusetts wiretap statute.

Generally speaking, the use of pen registers, "trap and trace" devices, and other like means for purposes of obtaining information such as telephone numbers dialed and telephone numbers from which calls were received is deemed an "interception" within the comprehension of the wiretap statute. As explained in *District Attorney for the Plymouth Dist.* v. *New England Tel. & Tel. Co.*, 379 Mass. 586, 591-592 (1980),

> "An interception is defined . . . to include the secret recording of 'the *contents* of any *wire* or oral communication through the use of any intercepting device' (emphasis supplied). G. L. c. 272, § 99 B 4. 'Contents' in turn is defined broadly to include, among other things, 'any information concerning the identity of the parties to such communication or the existence . . . of that communication.' G. L. c. 272, § 99 B 5. It is true that the information recorded by a cross frame unit trap (or a pen register) does not always establish that there was an oral communication, because the dialed call may not have been completed. However, the recording of the telephone number of the line from which a call was attempted is 'information concerning the identity of' a party to a communication and concerning 'the existence . . . of that

---

[5]Indeed, the defendant's voice is not on any of the voice-mail recordings.

communication.' Even if the call is not completed, the caller has initiated a wire communication to the surveyed telephone line which is intended to cause that telephone to ring and the existence of that communication is recorded by an intercepting device."

Assuming as we do for purposes of decision that activation of the "caller ID" function otherwise constitutes an "interception" within the comprehension of § 99 B 4 and B 5, and because the police did not obtain a warrant pursuant to § 99, the question then becomes whether the actions of the police fell within one of the enumerated exemptions from the statutory definition of the word "interception." Section 99 B 4 provides, in relevant part:

> "[I]t shall *not* constitute an interception for an investigative or law enforcement officer . . . to record or transmit a wire or oral communication if the officer is a party to such communication *or* has been given prior *authorization* to record or transmit the communication by such a party *and* if recorded or transmitted in the course of an investigation of a *designated offense* as defined herein" (emphasis supplied).

G. L. c. 272, § 99 B 4, inserted by St. 1968, c. 738, § 1. A "designated offense" includes an act of extortion or kidnapping committed "in connection with organized crime as defined in the preamble" to the wiretap statute. G. L. c. 272, § 99 B 7, inserted by St. 1968, c. 738, § 1. It is beyond dispute that the police were investigating a kidnapping and an attempted extortion. That being so, we next consider whether the kidnapping and attempted extortion were being committed "in connection with organized crime as defined in the preamble."

As defined by the preamble of § 99 and as interpreted by the court in *Commonwealth* v. *Thorpe*, 384 Mass. 271, 277 (1981), cert. denied, 454 U.S. 1147 (1982), the term "organized crime" means a "continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." G. L. c. 272, § 99 A, inserted by St. 1968, c. 738, § 1. The burden is on the Commonwealth to show "that the decision to intercept was made on the basis of a reasonable suspicion that interception would disclose or lead to evidence of

a designated offense in connection with organized crime." *Commonwealth* v. *Thorpe*, 384 Mass. at 281. The degree of apparent organization and discipline needed to support a reasonable suspicion of "connection with organized crime" has been the subject of numerous decisions since *Thorpe*. See *Commonwealth* v. *Lykus*, 406 Mass. 135, 142 (1989) (nature of crimes, kidnapping and extortion, as well as note sent to father of kidnapping victim demanding money, stating awareness of fact that police had been notified, and using word "we" held sufficient to show police had "reasonable suspicion that a wiretap would lead to evidence of a kidnapping involving organized criminal activity"). See also *Commonwealth* v. *D'Amour*, 428 Mass. 725, 736-737 (1999); *Commonwealth* v. *Zuluaga*, 43 Mass. App. Ct. 629, 634 (1997); *Commonwealth* v. *Abdul-Kareem*, 56 Mass. App. Ct. 78, 79-80 (2002); *Commonwealth* v. *Terzian*, 61 Mass. App. Ct. 739, 743-746 (2004).

These cases lead us to the conclusion that the police in the instant case had the requisite reasonable suspicion that electronic interception would disclose or lead to evidence of a kidnapping in connection with organized crime. We do not accept the defendant's intimation that the wiretap statute is in purpose solely a "Mafia busting tool." See *Commonwealth* v. *D'Amour*, 428 Mass. at 736 ("class of people subject to wiretaps includes more than 'full-time professional criminals' "), quoting from *Commonwealth* v. *Thorpe*, 384 Mass. at 277 n.6.

For these reasons we conclude that the "organized crime" exemption is applicable and that the evidence derived from the activation of the "caller ID" function on Gonzalez's cellular telephone was lawfully obtained.[6,7]

---

[6]Our conclusion makes it unnecessary for us to consider the Commonwealth's argument that electronic surveillance was permissible on the basis that it was conducted by Federal officers acting pursuant to Federal law and, therefore, within the scope of their authority. See G. L. c. 272, § 99 D 1 c. Although Federal agent David Donahue testified at the evidentiary hearing on the motion to suppress that the investigation was a "coordinated effort," such collaborative efforts have been found not to qualify for the Federal law enforcement exemption which is, generally, reserved for investigations conducted almost exclusively by Federal authorities. Compare *Commonwealth* v. *Jarabek*, 384 Mass. 293, 297 (1981), with *Commonwealth* v. *Gonzalez*, 426 Mass. 313, 314-317 (1997).

[7]The defendant raises no separate constitutional search and seizure issue

b. *The seizure of the firearm.* When the police arrived at 62 Clare Avenue, some gave chase to fleeing suspects and others, with their weapons drawn, forced their way into the apartment. While Special Agent Travaglia found Gonzalez lying on the floor of one of the bedrooms with a hood over his face, wrapped in tape, a ski mask pulled halfway up his face, a swollen welt on the back of his head, and his hands bound, Special Agent Cacace was conducting a protective sweep of the apartment.

In the course of the protective sweep, Cacace flipped a mattress off its box springs to make certain that no one was hiding beneath the bed. Cacace could not recall whether he looked under the box springs or removed any bed linens before lifting the mattress from the box springs. In any event, Cacace found a loaded handgun beneath the mattress and turned it over to Borgioli. This weapon is the subject of the defendant's unlawful firearm possession charge.

It is the defendant's argument that the handgun was discovered in the course of a warrantless search that exceeded the scope of a permissible protective sweep.[8] His argument is

based on art. 14 of the Massachusetts Declaration of Rights. While he might have had "automatic standing" to do so based on the fact that unlawful possession of a firearm is a possessory offense, see *Commonwealth* v. *Frazier*, 410 Mass. 235, 242-243 (1991), such an argument would not have met with success. We see no basis for an expectation of privacy in one's telephone number when making a telephone call, especially in this era of easy availability of features such as "caller ID" — the very feature that was utilized to identify the number from which the kidnappers were making their telephone calls to Benitez. See *Commonwealth* v. *Eason*, 427 Mass. at 600. As there was no reasonable expectation of privacy, there was no search, see *Commonwealth* v. *Carter*, 424 Mass. 409, 411-412 (1997), and, therefore, no requirement for a warrant. Even were a warrant thought to be required, we think the officers' actions would be justified in view of the exigent circumstances with which they were faced, namely, a kidnapping, a demand for the immediate payment of a ransom, and death threats. As stated by Special Agent Travaglia at trial, "The primary objective was to get Mr. Gonzalez back alive."

[8]The defendant makes no argument concerning the right of law enforcement officials to enter the apartment without a warrant. Even had such an argument been made, it would not have succeeded. At the time of the entry into the apartment, the police had reason to believe that Gonzalez had been kidnapped, that threats against his life had been made, that there were more than one kidnapper, and that shots had been fired, and the police heard glass shatter and saw people fleeing. The circumstances qualified as exigent. See *Commonwealth* v. *Paniaqua*, 413 Mass. 796, 797-799 (1992). See also *Com-*

based on what he perceives to be the unlikelihood that a person could hide between a mattress and a box spring.

We see nothing in the evidence presented at the hearing on the motion to suppress to show that the defendant had a reasonable expectation of privacy in the apartment. On the other hand, there was substantial evidence to show that the defendant did not live or work at 62 Clare Avenue. The apartment was leased to Dennis James, the telephone used to call Benitez as well as the van parked outside belonged to James, and no personal papers or belongings of the defendant were found in the apartment. See *Commonwealth* v. *D'Onofrio*, 396 Mass. 711, 714-715 (1986); *Commonwealth* v. *Carter*, 424 Mass. 409, 410-412 (1997); *Commonwealth* v. *Gomes*, 59 Mass. App. Ct. 332, 336 (2003).

Even were we to assume that the defendant had a reasonable expectation of privacy in the apartment, we would not conclude that Cacace's action of ripping the mattress from the bed rather than conducting a tidy and methodical protective sweep and exposing himself to grave danger by first looking beneath the bed exceeded the scope of a permissible protective sweep of the apartment. The police entered the apartment under chaotic and dangerous circumstances and without knowledge of the layout of the interior or opportunity for any meaningful deliberation. Although they knew that people had fled from the apartment, they did not know whether others remained hidden in the apartment and if so, whether they possessed or had access to weapons. Faced with this situation, we conclude that the firearm was discovered within the course of a permissible protective sweep of the apartment. See, e.g., *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 395, cert. denied, 516 U.S. 861 (1995); *Commonwealth* v. *Bass*, 24 Mass. App. Ct. 972, 974 (1987); *Commonwealth* v. *Moore*, 54 Mass. App. Ct. 334, 336-340 (2002).

c. *The defendant's statements to the police.* Claiming that the police hid part of the Miranda form that he signed from him

*monwealth* v. *Hall*, 366 Mass. 790, 801-803 (1975); *Commonwealth* v. *Forde*, 367 Mass. 798, 800 (1975); *Commonwealth* v. *DiToro*, 51 Mass. App. Ct. 191, 195 (2001); *Commonwealth* v. *Moore*, 54 Mass. App. Ct. 334, 338 (2002).

and that he was intoxicated at the time that he signed the Miranda waiver and spoke with the police, the defendant argues that the judge erred in denying his motion to suppress the statements he gave to the police. This argument warrants little discussion.

Having accepted Borgioli's testimony as credible, the judge found:

> "[Borgioli] advised [the defendant] of his Miranda rights by reading a written form together with [the defendant]. He dragged a pen underneath each sentence as he read it. [The defendant] signed the form in [Borgioli's] presence indicating he understood those rights and was waiving them. [The defendant] understood English and [Borgioli] found [him] to be coherent and not under the influence of alcohol or drugs."

In view of the fact that these findings are supported by the evidence, we need say no more than that we have not been shown any reason for departing from the well-established rule under which a judge's factual findings that are supported by evidence are not to be disturbed. See *Commonwealth* v. *Sicari*, 434 Mass. 732, 746-747 (2001), cert. denied, 534 U.S. 1142 (2002).

3. *The sufficiency of the evidence.* There was sufficient evidence to show that the defendant unlawfully possessed the firearm found at 62 Clare Avenue, a place other than the defendant's residence. See G. L. c. 269, § 10(*a*). As set out *supra* in parts 1 and 2(c) of this opinion, the defendant knowingly and voluntarily told the police that on April 23, 1999, he and a number of other people, including a man named Carmello, were present in the apartment at 62 Clare Avenue, that he saw a man bound and lying on the bathroom floor, that Carmello allowed him to hold and control the firearm in issue, and that he believed, albeit erroneously, see note 4, *supra*, that his fingerprints would be found on the gun.

In addition to the defendant's statements, there was substantial evidence, all as previously recited *supra* in part 2(c) of this opinion, to show that the defendant neither resided nor worked at 62 Clare Avenue, that the apartment was leased to Dennis

Commonwealth *v.* Mejia.

James, and that no personal papers or belongings of the defendant were found in the apartment. Although the defendant told Borgioli that he had stayed at the apartment at some unspecified time and had left some clothing there, the jury were free to disbelieve the defendant's statements on these points and, nonetheless, reasonably find that the apartment in which the defendant possessed the firearm was not his residence. See *Commonwealth* v. *Moore*, 54 Mass. App. Ct. at 342.[9]

*Judgment affirmed.*

---

[9]Our conclusion, that the evidence was sufficient to show actual possession of the firearm, makes it unnecessary for us to consider the defendant's contentions with respect to joint venture and constructive possession. Moreover, he has raised no issue concerning the appropriateness of a specific unanimity instruction. Nonetheless, we note that where the jury acquitted the defendant of the charges of armed kidnapping with the intent to extort and assault by means of a dangerous weapon, we think it more than reasonable to infer that their guilty verdict on the indictment brought under G. L. c. 269, § 10(*a*), was based on a finding of actual possession rather than on a joint venture or constructive possession theory.