## COMMONWEALTH *vs.* ROGER L. DEW, JR.

Suffolk. December 9, 2004. - March 10, 2005.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Warrant, Probable cause. *Probable Cause. Evidence,* Similar incidents, Relevancy and materiality, Grand jury proceedings, Prior misconduct, Declaration against interest, Corroborative evidence. *Practice, Criminal,* Argument by prosecutor, Capital case.

A trial court judge properly denied a criminal defendant's motion to suppress evidence found in a search of the multi-unit dwelling in which he lived, brought on the theory that the supporting warrant was invalid because it allowed a search of the entire dwelling, including units that the defendant did not occupy, where the affidavit accompanying the warrant amply supported the conclusion that the defendant had access to and use of all the units in the dwelling. [624-626]

At the trial of a murder indictment, the judge properly excluded evidence of an earlier, similar homicide, which the defendant offered to demonstrate that another perpetrator had committed both murders, where the defendant failed to provide any evidence of his lack of involvement in the earlier crime [626-627]; further, the judge's refusal to allow the defendant to inquire into the earlier crime or to obtain grand jury testimony relating to that crime did not impair the defendant's right to a fair trial or to present a defense, where the judge correctly found that the crime was irrelevant and unrelated to the murder in the instant case and that disclosure of the grand jury minutes would have affected the investigation of the crime [627-628].

At the trial of a murder indictment arising out of a failed drug purchase, the judge did not abuse his discretion in excluding testimony that the defendant was not a drug dealer and had purchased drugs in the past from a prosecution witness, where such testimony constituted evidence of the witness's prior bad acts, was relevant only to collateral matters, and even if admitted, would have added little, if anything, to the defense. [628-629]

At a murder trial, the judge did not err in excluding hearsay evidence that the defendant's cousin had confessed to the murder, where the defendant failed to demonstrate sufficient corroboration of the statement's trustworthiness. [629-631]

A criminal defendant failed to demonstrate that the prosecutor at his murder trial made improper and prejudicial comments during closing argument. [631-633]

INDICTMENTS found and returned in the Superior Court Department on April 29, 1999.

A motion for disclosure of grand jury minutes was heard by *Wendie I. Gershengorn*, J.; a motion to suppress evidence was heard by *James D. McDaniel, Jr.*, J., and the cases were tried before him.

*Dana Alan Curhan* for the defendant.

*Christina E. Miller*, Assistant District Attorney, for the Commonwealth.

CORDY, J. During the early morning hours of January 30, 1999, in the vestibule of a rooming house in the Roxbury section of Boston, Ovid McIver was shot and killed when his attempt to purchase crack cocaine from a drug dealer known as "James" turned into a fatal robbery. On January 25, 2002, after a ten-day trial, a jury convicted Roger L. Dew, Jr., a man whom witnesses identified as "James," of felony-murder in the first degree, armed robbery, and the illegal possession of a firearm.[1]

On appeal, Dew claims that he is entitled to a new trial because (1) his motion to suppress evidence found in the multifamily home in which he lived was erroneously denied; (2) potentially exculpatory evidence of another drug-related murder at the same rooming house two days before McIver's murder was excluded at trial; (3) he was prevented from testifying that he was not a drug dealer and only a drug user who had purchased drugs in the past from a prosecution witness; (4) the trial judge erred in excluding evidence that Dew's cousin confessed to the murder; and (5) the prosecutor made improper and prejudicial comments during closing argument. Dew also asks the court to exercise its discretionary power under G. L. c. 278, § 33E, to order a new trial or reduce the degree of murder. The claims are without merit, and after a thorough review of the record, we affirm his convictions and decline to grant relief under § 33E.

1. *Facts.* The jury could have found the following. On January 29, 1999, Linda Bennett suggested to her sister's boy friend, Ovid McIver, and his friend, Hussein Mucmin, that they visit a man known as "Popcorn," who lived in a rooming house

---

[1] The trial judge subsequently dismissed the armed robbery indictment as the felony offense underlying the felony-murder conviction. See *Commonwealth* v. *Cruz*, 442 Mass. 299, 300 n.1 (2004).

located at 146 Stanwood Street. The purpose of their visit was to purchase crack cocaine.

After arriving at the address, Bennett, McIver, and Mucmin met with Popcorn in his room, where they were introduced to a young man called "James." James had been dealing cocaine in the rooming house that day. At Popcorn's request, James sold his last four bags of cocaine to Mucmin. In making the purchase, Mucmin revealed a large amount of cash. While Mucmin, Bennett, McIver, and Popcorn smoked the crack cocaine, James smoked Newport cigarettes, using a bottle cap as an ashtray. Mucmin told James that he wanted to buy more cocaine, and James agreed to find more and return with some smaller bills for change. Mucmin briefly returned to his vehicle to conceal some of the cash under the driver's side floor mat and to lock the doors. While outside, he watched James leave in a gray vehicle that Popcorn would later testify he had seen James drive in the neighborhood.

After waiting for thirty minutes, Popcorn, Bennett, McIver, and Mucmin decided to leave 146 Stanwood Street. Near the front door, Popcorn and Bennett encountered James, who asked whether they still wanted cocaine. Popcorn told him they were "all set," and Bennett and Popcorn proceeded outside. Coming down the house's stairway behind Popcorn and Bennett, Mucmin and McIver also encountered James near the house's entrance. Mucmin, McIver, and James, intent on completing another deal, together walked into the vestibule at the base of the house's stairway and closed the front door.

Mucmin was the sole witness to the events in the vestibule. According to his testimony, James stepped back, pulled out a gun, raised the barrel to within four or five inches of Mucmin's temple, and demanded Mucmin's money. Mucmin gave him what cash he had. After a pause, James backed toward the stairs, aiming the gun at both Mucmin and McIver. Suddenly, McIver lunged at the much smaller James, grabbed his wrist, and wrestled him on the stairs. Within moments, James managed to regain control of the weapon, pointed it at McIver's stomach, and shot him once in the stomach.

Outside, Popcorn and Bennett heard the gunshot and began running down Stanwood Street toward its intersection with

Columbia Road. Mucmin ran from the vestibule and away from the rooming house, following Popcorn and Bennett and eventually joining them. They reached a public telephone outside an automotive repair shop on Columbia Road and telephoned 911. A recording of the call was played at trial. Meanwhile, James left the scene in his gray vehicle.[2]

The police quickly arrived and McIver was transported to a hospital, where he died from the gunshot wound. Popcorn, Mucmin, and Bennett walked back to Stanwood Street where officers separately interviewed them. Homicide detectives later took detailed statements from each witness in interviews at the police station. All of the witnesses provided similar accounts of the night's events and relatively consistent descriptions of "James." In photographic arrays and during the trial, the witnesses identified the defendant, Roger L. Dew, Jr., as "James."

Pursuant to a search warrant for 146 Stanwood Street, the police recovered a spent shell casing and a black knit cap from the vestibule, and a crack pipe, cigarette butts, and a pack of Newport cigarettes from Popcorn's room. Deoxyribonucleic acid (DNA) testing subsequently performed on one of the Newport cigarette butts from Popcorn's room revealed a DNA profile that was consistent with Dew's. At trial, this DNA evidence proved damaging to Dew's defense that he was never in Popcorn's room and was not dealing crack cocaine at 146 Stanwood Street on the night of the murder.

Some time after the murder, Bennett saw Dew in the same gray motor vehicle she had seen outside 146 Stanwood Street just before the murder and wrote down two registration plate numbers. She provided the numbers to her sister, McIver's girl friend, who contacted the police to report the information. The police noticed that a vehicle matching the witnesses' descrip-

---

[2]Margo Ortiz and her boy friend Frizell Seldon, who were living on the second floor of 146 Stanwood Street, also heard the gunshot and peered out from their window overlooking the yard in front of the house. Ortiz saw a pair of legs in the snow and slowly went downstairs and outside, where she discovered a dying McIver. After trying to comfort him, she returned upstairs to telephone for assistance. Ortiz had seen "James" arrive at 146 Stanwood Street earlier that evening in a gray vehicle, and she bought crack cocaine from him at that time. Ortiz had argued with James about money shortly before he went to Popcorn's room and sold Mucmin his last bags of cocaine.

tions was often parked near 51 Stanwood Street, a multi-family house where Dew and his extended family lived. The motor vehicle was a Buick Century automobile registered to a woman who was the girl friend of the defendant's brother. That brother was one of the family members residing at 51 Stanwood Street.

On February 11, 1999, police officers (unaware of the murder investigation) stopped the vehicle for a speeding violation. Dew was driving and produced a learner's permit. When the police checked with the registry of motor vehicles, they discovered that Dew's license had been suspended. The officers gave him a verbal warning and directed him to drive to his house immediately and not to drive again until his license was valid. Dew told the officers that he lived at 51 Stanwood Street. Police later drove by Dew's home and saw that it was a three-floor multi-family house. On February 17, 1999, the same officers (now apprised of the murder investigation) observed Dew again driving the same vehicle. After stopping the vehicle, the officers asked Dew to clarify his living situation. Dew told them that he lived with his cousins and their children on the third floor of 51 Stanwood Street but had access to the entire house, and that his family frequently went into each other's apartments. The officers again allowed Dew to return home.

Shortly thereafter, Sergeant Robert P. Harrington, the detective in charge of the investigation, obtained an arrest warrant for Roger L. Dew, Jr., and a search warrant for the house at 51 Stanwood Street. Police executed the warrants on February 19, 1999, finding Dew in a bedroom on the third floor with his girl friend and their infant daughter. Police recovered Dew's learner's permit from the bedroom, and a plastic cooler containing a spent .380 caliber shell casing and a live .38 caliber bullet from another bedroom on the same floor. The Boston police department's ballistics expert testified that the spent casing was consistent with having been fired from the same gun as the spent casing found at the murder scene.

2. *Motion to suppress.* One of the search warrants obtained by the police authorized them to search the house at 51 Stanwood Street "and any residential unit ther[e]in as well as any storage and common areas and any other areas to which [Dew] would have access, including the first, second, and third

floors"[3] Before trial, Dew filed a motion to suppress the evidence seized from the third floor, arguing that the warrant was invalid because it allowed the search of the entire multi-unit dwelling including units he did not occupy. The motion was denied.

On appeal, Dew contends that the evidence seized pursuant to the warrant should have been excluded under the principle that a "warrant which directs the search of an entire multiple-occupancy building, when probable cause exists to search only one or more separate dwelling units within the building, is void because of the likelihood that all units within the dwelling will be subjected to unjustified and indiscriminate search." *Commonwealth* v. *Dominguez*, 57 Mass. App. Ct. 606, 609 (2003), quoting *Commonwealth* v. *Erickson*, 14 Mass. App. Ct. 501, 504 (1982). He argues that his familial relationship to the building's other residents does not demonstrate his control over their apartments and that the police only had probable cause to search the first-floor apartment because that was the address on his learner's permit.[4] Consequently, the warrant authorizing the search of the entire building at 51 Stanwood Street was overbroad and "void."

We are not persuaded that the warrant was defective on this ground. If Dew had access to and use of all the units in the house, a warrant encompassing a search of the entire building was appropriate. See *Commonwealth* v. *LaPlante*, 416 Mass. 433, 439 & n.8 (1993). See also *Commonwealth* v. *Rise*, 50 Mass. App. Ct. 836, 840 (2001); *Commonwealth* v. *Erickson*, *supra* at 504. Sergeant Harrington's affidavit in support of the warrant amply supports the conclusion that Dew had such access and use. This conclusion is based on more than the mere fact that the residents of the multi-family house are related. The affidavit details Dew's admissions to the officers who stopped his vehicle on two occasions after the murder that he lived on

---

[3]The police also obtained a warrant to search the gray Buick Century automobile. That warrant is not challenged on appeal.

[4]Boston Edison records described in the search warrant affidavit reveal accounts for service at 51 Stanwood Street in three different names. The first floor was in the name of Clara Dew, the second floor was in the name of Charlie Hunter (the defendant's aunt), and the third floor was in the name of Walter Dew.

the third floor, that the house was shared by members of his extended family, and that the family "ha[d] the whole building." The affidavit also contains information that Dew occasionally lived elsewhere in the building, and that the extended Dew family treated the building as a single compound. For example, it confirms that Dew listed his address as 51 Stanwood Street, apartment one, when he applied to the registry for his learner's permit, and reveals that Dew's aunt (who resides in the second-floor apartment) claimed that he lived with her when she verified his address to Dew's probation officer in 1999. The affidavit also explains that the post office delivered mail to 51 Stanwood Street by literally throwing it, unsorted by apartment, onto the house's porch, because the presence of pit bull terriers prevented carriers from approaching the house, and that residents of the house had prevented the police, investigating another case some two months before the murder, from reading names on the building's separate doorbells and ascertaining who lived in which units.

What is apparent from the affidavit is that, through "reasonable investigation," the police determined that Dew had access to all the units at 51 Stanwood Street and "that the defendant had sufficient access and control over the entire structure so as to warrant a finding of probable cause [to search] the entire building." *Commonwealth* v. *LaPlante, supra* at 439 (warrant to search whole house not overbroad where house "reasonably appeared to be used by entire family"). Dew's motion to suppress the evidence from 51 Stanwood Street was properly denied.

3. *Evidence of earlier murder.* The grand jury that indicted Dew also heard evidence regarding the fatal shooting of John McBride that had occurred at 146 Stanwood Street two days before the murder of McIver. At trial, and over Dew's objection, the judge refused to permit Dew to refer to or offer evidence about the McBride homicide. On appeal, Dew argues that the judge's ruling impaired his constitutional right to present a defense because inquiry into the McBride murder, which bore some resemblance to the murder in this case, could have helped him show that another perpetrator committed both murders. In addition, Dew argues separately that his inability to obtain pretrial discovery of the grand jury transcripts relating to the

McBride murder unfairly precluded him from carrying his burden to establish its relevance.

A defendant has the right "to introduce evidence that another person recently committed a similar crime by similar methods, since such evidence tends to show that someone other than the accused committed the particular crime." *Commonwealth* v. *Jewett*, 392 Mass. 558, 562 (1984). In his admittedly "sketchy" offer of proof about the McBride murder, Dew noted the similarities between the crimes: the previous murder took place in the same building and involved crack cocaine, and several of the witnesses to the McIver murder were also apparently witnesses in the McBride case.

However, to offer evidence of another similar crime, a defendant must also "provide [a] basis for a conclusion that [he] was not the perpetrator of that crime." *Commonwealth* v. *Perito*, 417 Mass. 674, 685 (1994), citing *Commonwealth* v. *Jewett, supra* at 560-562 (proffered evidence showed relevance where offer of proof indicated that defendant could not have perpetrated crime), and *Commonwealth* v. *Brown*, 27 Mass. App. Ct. 72, 76 (1989) ("there must be reasonable assurance that the defendant at bar did not commit the 'similar' offense, that it was in fact committed by someone else"). As in *Commonwealth* v. *Perito, supra*, Dew provided no evidence of his lack of involvement in the earlier crime. Consequently, the judge properly found that evidence regarding the McBride murder was not relevant. "Although the decision of a trial judge to admit or reject evidence of other crimes ordinarily will not be disturbed, that decision . . . may be set aside if justice requires a different result." *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979). We find no basis on which to conclude that justice required a different result in this case.

Dew claims that any failure on his part to establish the relevance of the McBride murder flows from his inability to obtain discovery of grand jury testimony relating to that murder. That testimony was subject to an impoundment order sought by the Commonwealth prior to trial after it had provided Dew with the transcribed grand jury testimony regarding his indictments, with certain portions related to the McBride homicide redacted. The motion judge, after reviewing the redactions, and over

Dew's objection, impounded those portions of the transcripts, concluding that their disclosure "could have adverse affects [*sic*] on the investigation" of the McBride homicide. See Mass. R. Crim. P. 14 (a) (6), 378 Mass. 874 (1979); *Newspapers of New England, Inc.* v. *Clerk-Magistrate of the Ware Div. of the Dist. Court Dep't*, 403 Mass. 628, 631-632 (1988), quoting *H.S. Gere & Sons* v. *Frey*, 400 Mass. 326, 329 (1987) ("It is within the discretion of a court to impound its files in a case and to deny public inspection of them, and that is often done when justice so requires"). The judge also found that the Commonwealth's redactions were "entirely appropriate and not over-inclusive," and that none of the redacted testimony was relevant to the McIver murder.

Judges have discretion to limit the disclosure of grand jury minutes to defendants in order "to protect persons mentioned or for other reasons of security." *Commonwealth* v. *Stewart*, 365 Mass. 99, 106 (1974). In addition, "the Commonwealth may urge that disclosure be limited on grounds of irrelevance." *Id.* In our review, we examined the redacted portions of the grand jury minutes. Although we recognize that the impoundment order may have made Dew's task of determining whether the McBride homicide was relevant to his defense more difficult, the judge was correct in her finding that the testimony regarding the McBride homicide was irrelevant and unrelated to the McIver murder, and that disclosure could have adversely affected that investigation.[5] Neither the trial judge's refusal to allow Dew to inquire into the McBride murder nor the impoundment order itself impaired Dew's right to a fair trial or to present a defense.

4. *Exclusion of the defendant's testimony.* Dew contends that the judge erred by refusing to allow him to testify that he used but never sold drugs, and that he had previously visited 146 Stanwood Street to purchase drugs from Popcorn.[6] At trial, defense counsel indicated that he was seeking to pursue this

---

[5]There is no evidence or suggestion that Dew was prevented from conducting his own investigation into the circumstances surrounding the McBride homicide for the purpose of attempting to make the requisite showing of relevance.

[6]On appeal, Dew also appears to argue that the judge erred by precluding him from testifying about his purchase of drugs from Popcorn on the evening

line of questioning to show the witnesses' motive to "fabricate" their accounts of the murder to "frame" Dew. The judge sustained the Commonwealth's objection to Dew's testifying about past drug purchases from Popcorn, ruling that such testimony was irrelevant evidence of Popcorn's prior bad acts.[7] Dew objected to the judge's ruling at the time and renewed his objection in a later motion for a mistrial.

The judge did not abuse his discretion in excluding this testimony. Generally, "admissibility of . . . evidence of prior bad acts lies in large measure in the discretion of the trial judge." Commonwealth v. McGeoghean, 412 Mass. 839, 841 (1992). Here, the excluded testimony was an attempt to challenge the credibility of Popcorn and the other government witnesses by introducing evidence of past transactions entirely unrelated to the events on the night of the murder. The judge was correct that evidence of the witness's prior bad acts went to collateral matters and was inadmissible for this purpose. See Commonwealth v. LaVelle, 414 Mass. 146, 151-152 (1993). P.J. Liacos, M.S. Brodin & M. Avery, Massachusetts Evidence § 6.10.3, 329-330 (7th ed. 1999).

In addition, this testimony, had it been admitted, would have added little if anything to the defense. Popcorn had already been cross-examined by defense counsel about his history of drug dealing and his reputation for selling drugs, and had admitted that he distributed cocaine in a school zone, a charge that had been dismissed as a part of an agreement with the Commonwealth for his testimony in this case. In this context, Dew's testimony about past drug transactions with Popcorn would not have appreciably changed the jury's perceptions of Popcorn or Dew, nor provided support to the defense theory that Popcorn had a motive to "frame" him. There was no error.

5. *Exclusion of Anthony Dew's admission.* At trial, Dew testified that he was with his girl friend at 51 Stanwood Street at the

---

of the murder. The trial transcript reveals that Dew never proffered and the judge never prevented any such testimony. Indeed, the defense theory at trial was, in the words of his counsel, that "he wasn't even there that night."

[7]Dew was not prevented from testifying on direct examination that he was a drug user and not a dealer, and, on cross-examination was asked by the prosecutor, "you weren't just a user. You started selling narcotics; correct?" Dew answered, "I wouldn't say 'selling'; but yeah."

time of the murder. The defense also attempted to introduce evidence, through the testimony of a woman named Shercora Baker, that Dew's cousin, Anthony Dew (Anthony), had admitted to her that he murdered Ovid McIver. This testimony was clearly inadmissible unless it conformed to a hearsay exception. Dew contended that it was admissible as a statement made by Anthony against his penal interest. In a voir dire hearing on the ninth day of the trial, Baker testified that Anthony told her, during a brief conversation in Franklin Field on a summer night in 2000, that he was responsible for the murder.[8] The judge denied Dew's motion to admit the testimony, relying on *Commonwealth v. DiToro*, 51 Mass. App. Ct. 191 (2001), where the Appeals Court upheld the exclusion of hearsay testimony about a declarant's statement against penal interest for lack of "sufficient corroboration." *Id.* at 199.

To be admissible as a statement against penal interest: "[1] [T]he declarant's testimony must be unavailable; [2] the statement must so far tend to subject the declarant to criminal liability 'that a reasonable man in his position would not have made the statement unless he believed it to be true'; and [3] the statement, if offered to exculpate the accused, must be corroborated by circumstances clearly indicating its trustworthiness." *Commonwealth v. Drew*, 397 Mass. 65, 73 (1986), quoting *United States v. Thomas*, 571 F.2d 285, 288 (5th Cir. 1978).

Dew argues that Anthony's statement to Baker satisfied this test and should have been admitted at trial. He first notes that Anthony's testimony was unavailable because he asserted his privilege against self-incrimination in a voir dire hearing before the trial.[9] He then contends that the statements were clearly against penal interest, an issue the judge found unnecessary to

---

[8] Specifically, Baker testified that she asked Anthony, "How is your cousin doing," to which he responded, "It's fucked up. Because he didn't even do it." Baker then asked, "What do you mean, like, it's fucked up?" to which he responded, "Because I did it."

[9] Anthony's claim of privilege made his testimony "unavailable," satisfying the first part of the test in *Commonwealth v. Drew*, 397 Mass. 65, 73 (1986). See *Commonwealth v. Galloway*, 404 Mass. 204, 208 (1989) (witness's claim of privilege against self-incrimination makes testimony unavailable). We also note that, on the fourth day of the trial, the judge banned Anthony from the court house after learning that he had been convicted of intimidating a witness

decide. Finally, he argues that the following circumstances are sufficient corroboration of the statement's trustworthiness as to present "some reasonable likelihood that the statement could be true," *Commonwealth* v. *Drew*, *supra* at 76: (1) Anthony and Dew are the same age and resemble each other; (2) Anthony lived with the rest of the Dew family at 51 Stanwood Street; and (3) Baker knew both men from an early age and had no apparent bias against Anthony.

We disagree that the defendant met his burden of demonstrating trustworthiness. The evidence provided almost no corroboration for the trustworthiness of Baker's testimony. The witnesses testified unequivocally that Dew and Anthony bore little resemblance to each other, and Baker testified at the voir dire hearing that she knew Anthony to be a liar. Dew's "corroboration" for Anthony's admission to Baker consists solely of speculation. The absence of circumstances that disprove the statement does not constitute a "reasonable likelihood that the statement could be true." *Commonwealth* v. *Drew*, *supra* at 76. There was no independent evidence that Anthony might have committed the murder. Contrast *Commonwealth* v. *Charles*, 428 Mass. 672, 680 (1999) (sufficient corroboration where other "independent evidence" supported declarant's statement to investigator describing his dual roles as driver and passenger in fraudulent insurance claim case). Although "the judge should not be stringent" in evaluating whether a statement is adequately corroborated, *Commonwealth* v. *Drew*, *supra* at 75 n.10, "judges are obliged to exercise a discriminating judgment" in assessing the likelihood that the declarant's statement is true based on the circumstances of the case. *Commonwealth* v. *Carr*, 373 Mass. 617, 624 (1977). The judge properly made such a judgment here. There was no error in the exclusion of Baker's hearsay testimony.

6. *Prosecutor's closing argument.* During the prosecutor's closing argument, he made the following remarks:

"And ask yourselves who is Roger Dew to these people? Who is the defendant to Linda Bennett? Who is

in this case, James "Popcorn" Whitley, in 2000, and that he was walking back and forth in the corridor outside the court room during the trial.

the defendant to James Whitley? Who is the defendant to Margo Ortiz and Frizell Seldon? . . . And I suggest to you the credible evidence is, as you heard, that he was *a crack dealer, a gun-carrying crack dealer* back in January of 1999. And that's how they knew Roger Dew. That's what he was to them. . . . And I suggest to you the capacity in which he was known to those people was as a drug dealer. And, if there is one person that they're going to know about, it's who's going to be the person that's supplying their drugs." (Emphasis added.)

Dew argues that the prosecutor's characterization of him as "a crack dealer, a gun-carrying crack dealer" was improper, prejudicial, and went beyond the reasonable inferences that could be drawn from the evidence. He objected to the comment immediately after the conclusion of the prosecutor's closing argument, and moved for a mistrial. He renewed his motion for a mistrial in a written pleading filed the next day.

The prosecutor's comment that Dew was a "gun-carrying crack dealer" was warranted by the evidence in the Commonwealth's case. The prosecution's key witnesses — Popcorn, Bennett, Mucmin, Ortiz, and Seldon — all testified that Dew was selling crack cocaine at 146 Stanwood Street on the night of the murder. Mucmin, the sole witness to testify to the fatal robbery in the vestibule, testified that Dew drew a gun. In this context, we cannot say that the prosecutor's remark was "not fairly inferable from the evidence." *Commonwealth* v. *Coren,* 437 Mass. 723, 732 (2002), quoting *Commonwealth* v. *Pope,* 406 Mass. 581, 587 (1990).

That the comment had the virtue of being sharp and direct does not justify a conclusion that it was prejudicially inflammatory. "The prosecutor would cross the line into impermissible argument if he were to stress repeatedly aspects of the scene that were highly prejudicial to the defendant but only peripherally relevant to the defendant's guilt or innocence." *Commonwealth* v. *Santiago,* 425 Mass. 491, 497-498 (1997), *S.C.,* 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). In the context of the point the prosecutor was making (i.e., that the witnesses' prior interactions with the defendant gave them a solid basis for recognizing and identifying him on the night of the murder), this information was of

obvious relevance. The prosecutor's single use of the term "gun-carrying crack dealer" and three uses of the term "dealer" to describe Dew in the challenged portion of the argument were neither excessive in these circumstances, nor overly inflammatory, nor had any improper "cumulative effect." *Commonwealth* v. *Santiago, supra* at 500. See *Commonwealth* v. *Lyons*, 426 Mass. 466, 472 (1998). We note as well that "the judge's instructions . . . focused the jury on the proper consideration of the evidence apart from the closing arguments of counsel." *Commonwealth* v. *Valentin*, 420 Mass. 263, 274-275 (1995). There was no error in the prosecutor's comments.

7. *G. L. c. 278, § 33E, relief.* Dew was well represented by able counsel, and there is no accumulation of errors that leads us to conclude that the interests of justice require a reduced verdict or a new trial. After reviewing the whole record in this case, we find no grounds to exercise our extraordinary authority under G. L. c. 278, § 33E, to reduce the murder verdict.

*Judgments affirmed.*