COMMONWEALTH *vs.* TYRAN DANIELS.

Hampden. September 9, 2005. - November 23, 2005.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & CORDY, JJ.

*Evidence,* Exculpatory. *Due Process of Law,* Disclosure of evidence. *Practice, Criminal,* Disclosure of evidence, Suppression of evidence by prosecutor, New trial, Capital case.

The judge in a murder case erred in denying the defendant's motion for post-trial discovery, where the Commonwealth had in its possession evidence specifically requested by the defendant before the trial that was clearly helpful to his defense, and where the Commonwealth had a continuing duty to review the material and to disclose to the defendant any favorable evidence it found; therefore, this court remanded the matter for further proceedings, including a motion for a new trial and a hearing thereon, if warranted by the posttrial discovery. [401-410]

INDICTMENTS found and returned in the Superior Court Department on November 13, 1998.

The cases were tried before *Mary-Lou Rup*, J., and motions for posttrial discovery and for a new trial were heard by her.

*Dana Alan Curhan* (*Brad P. Bennion* with him) for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. A Superior Court jury convicted the defendant of murder in the first degree on a theory of felony-murder. G. L. c. 265, § 1. The principal issue on appeal is whether a judge in the Superior Court, who had presided at trial, erred in denying the defendant's request for posttrial discovery. The request concerned newly discovered information that defense counsel asserted cast serious doubt on the credibility of the identification of the defendant made by the sole eyewitness. The reliability of that testimony is central because, as the trial judge noted in a different ruling, the "Commonwealth's evidence against this defendant [was] based almost entirely upon the

testimony of one eyewitness who had only a split second opportunity to view the offender, and with minimal if any corroboration of the defendant's presence at the scene."

The murder took place during an armed robbery and home invasion by three men — two masked, one unmasked — in an apartment in Springfield. The victim's girl friend identified the defendant as the unmasked accomplice months after the event, and only after her cousin suggested the defendant's name to her as someone who "h[u]ng[]around" with James Brown, a man she knew the police had arrested as the masked shooter. Brown was later acquitted.[1]

After deliberating over the course of three days, the jury convicted the defendant of murder in the first degree. He also was convicted of armed robbery, assault and battery by means of a dangerous weapon, and unlawful possession of a firearm. The defendant appeals from these convictions and from the denial of his motions for postconviction discovery of exculpatory evidence and for a new trial.

In his postconviction motions and now in this consolidated appeal, the defendant claims that the Commonwealth withheld exculpatory evidence that he had specifically requested before the trial, which he claims would have materially aided his defense. In addition, he asserts that the judge improperly denied those motions without a hearing. The defendant also requests that we exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the murder verdict.

With full cognizance of a trial judge's broad discretion in deciding postjudgment discovery motions, *Commonwealth* v. *Tucceri*, 412 Mass. 401, 409 (1992), we are compelled by the unusual circumstances of this case to conclude that the judge should have allowed the motion for posttrial discovery. As we shall explain, the Commonwealth had in its possession evidence

---

[1]There was no physical evidence connected to the defendant. Apart from the girl friend's testimony, the only evidence against him came from an inmate who testified that in November, 1998, when they were both in lockup in the Superior Court House in Springfield, the defendant told him that Brown "bugged out" and shot the victim. The inmate testified that the defendant did not say that he "put himself" at the shooting.

specifically requested by the defendant that was clearly helpful to his defense. The evidence suggested that a person other than Brown was the masked shooter. If the masked shooter was not Brown, then the eyewitness's identification of the defendant as an accomplice of Brown, which was prompted by her learning that the defendant was an acquaintance of Brown, loses credibility and the integrity of the defendant's convictions is compromised. We therefore reverse the denial of the defendant's motion for postconviction discovery. If postconviction discovery so warrants, the defendant may file a renewed motion for a new trial and a motion for a hearing. The defendant may file a motion for costs for the preparation and presentation of such a motion. Mass. R. Crim. P. 30 (c) (5), as appearing in 435 Mass. 1501 (2001).

1. *Factual background.* The extraordinary circumstances of this case require us to discuss its factual and procedural history in some detail.

a. *The murder.* We begin with the facts as the jury could have found them. Wanda Brady was the eyewitness who identified the defendant as the unmasked accomplice. Brady testified that shortly after 10 P.M. on August 31, 1998, she returned home to 87 Quincy Street in Springfield with the victim, her daughters (aged seven and nine years), her nephew (aged six years), and the victim's son (aged four years). The victim soon left to purchase some groceries. While alone in the apartment with the four children, Brady heard a knock at her front door. On her inquiry, a male voice twice identified himself as "Chandler," a friend of the victim whom Brady knew. She opened the door. A masked assailant grabbed Brady, held her head down, commanded her not to look at him, and twice hit the back of her head with a gun. With her head down, Brady saw two pairs of feet enter her apartment behind the masked assailant. She saw one set of feet enter her daughters' bedroom, then heard her daughters crying for her.

The masked assailant forced Brady into her bedroom, asked her where "the money was at," and hit her again. She opened the "top drawer" where she knew the victim kept money, and

the man took what Brady testified could have been over $1,000.[2] Still holding her head down, the assailant brought her down the hall to the bathroom, where the two boys were in the bathtub. Brady pointed to the bathroom ceiling, where she knew the victim sometimes hid money.

Finding no money in the ceiling, the masked assailant took Brady back to the living room, sat her in a chair, and called to the second masked intruder to bind Brady with duct tape. He taped her hands behind her back and taped her mouth by winding tape around her head. The masked assailant then directed his masked accomplice to wait for the victim outside the rear door, and Brady saw or heard nothing further from that accomplice. As she remained bound in the living room, Brady could hear the masked assailant lifting the toilet tank cover. She could also hear the third intruder in her children's bedroom, where all the children were now gathered, clicking a gun; the children were crying.

At trial, Brady testified that the masked assailant then took her toward the children's bedroom, removed the tape from her mouth, pushed her head into the room, and told her to keep the children quiet. Although her head was down, Brady could see the four children sitting on the bottom bunk bed. For a brief period, she testified, she saw the face of the third, unmasked man standing by the door.[3] Her trial testimony was to the effect that she "got a good look at him." She later described him to police as light-skinned. She did not recognize him.

Soon thereafter, the victim returned from his errand and knocked on the door. The masked assailant took Brady to the door, forced her to kneel down, and demanded she ask who was

---

[2] Brady told the jury that the victim had obtained the money by "[d]ealing drugs."

[3] In Brady's first statement to the police, she did not tell them that the masked assailant pushed her head into the children's bedroom. She told the police that after she was taped, the masked assailant "made me go to the front door with him and he sent the guy that taped me up out the back door to go wait for [the victim]. The guy with the mask made me kneel at the front door and took the tape off [my] mouth." In her later three statements to police, which were not introduced at trial, Brady also said nothing about seeing the face of the unmasked man or about her head being "shoved" into the bedroom. She also did not testify to these facts at grand jury proceedings in October, 1998.

there. The victim replied, "Me." The masked assailant told Brady to tell the victim, "[T]his is payback," and then the unmasked accomplice came from the children's bedroom and opened the door.[4] The masked assailant grabbed the victim by his neck, pushed him back into the hallway, and shot the victim in the head. The two men then ran out the front door. The victim never regained consciousness and died one week later from the gunshot wound.

b. *Brady's various descriptions of the unmasked accomplice.* When the police arrived in response to Brady's call, she described the unmasked assailant as about five feet tall, between eighteen and twenty-three years old, light-skinned, and wearing a tan hat.[5] She did not tell the police that she had seen his face, see note 3, *supra*, nor did she describe the unmasked accomplice as having a large nose.[6] She did not tell the police that she recognized the unmasked accomplice. Police canvassed the neighborhood and returned to the apartment with three men for a "showup" and voice identification by Brady.[7] Brady told the police she could not identify any of them.

Shortly thereafter, Brady left her apartment and went to the police station, where she gave her first written statement.[8] She described the unmasked accomplice as "a light skinned black guy," five feet tall, eighteen to twenty-two years old. She gave no further details about him. Brady then went to the hospital to have her head injuries treated.

---

[4]Brady did not say that she could see his face.

[5]At trial, Brady described him as "mixed race."

[6]At trial, Brady testified that when she saw the unmasked man in the children's bedroom, she noticed that he had "a big nose." Brady did not describe the unmasked man as having a big nose until after she had identified the defendant (who has, according to trial counsel, "a large disfigured nose") as the unmasked accomplice. When first questioned at the scene, she did not tell the police that the unmasked assailant had a big nose. Nor was there any mention of a "big nose" in any of Brady's four written statements to the police or in her testimony before the grand jury.

[7]Brady testified that the police brought three men to the "showup" identification. Springfield police Lieutenant Thomas Kelly testified that four men were brought to the scene, but he did not remember who they were. He could not remember whether the defendant was one of the four.

[8]The time noted on the statement is 12:30 P.M. on September 1, 1998. Brady testified that she spoke with police shortly after midnight on September 1, 1998.

c. *Identification of other suspects*. Subsequent relevant events involve a number of individuals in various contexts. Because descriptions of the formal and informal identifications of possible suspects is confusing, we discuss each individual in turn.

The first individual is Jack Jackson. At the hospital, Brady encountered the victim's friend, Chandler, and Chandler's sister, Tomayita Stevenson. Brady told Stevenson that the intruders had used Chandler's name before she let them into the apartment. According to Brady, Stevenson then told her that Chandler and a man named Jack Jackson were having problems and she surmised that one of the intruders was probably Jackson. She described Jackson as a man about five feet four inches tall and with a clean shaven head.

Several hours later, around 10:15 A.M. on September 1, Brady returned to the police station to give a second statement. Brady told police that one of the men in the showup identification the night before was the same weight and build and was wearing the same jeans and boots as the masked shooter. She also told the police that at the showup she had recognized his voice as that of the masked assailant, but had not said anything to the police because she was afraid. "I'll never forget that voice," she told the police. Next, Brady viewed a photographic array. Brady picked out one photograph, telling the police that she was sixty-five to seventy per cent sure that the individual was the man from the "showup" whose voice she recognized. The man Brady identified as the masked killer was Jackson.[9]

We next turn to Wayne Rowe, who is relevant because he is directly linked to the defendant's request for pretrial and post-trial exculpatory discovery. On September 1, during her second police interview, Brady told the police that a man named Wayne Rowe was the *only* person she knew who "might have a problem with" the victim. At trial, she testified that the victim and Rowe had been friends, that they had had a dispute over money, and that the victim had purchased a gun to protect

---

[9]Stevenson testified that she had been outside Brady's apartment house on the night of the murder, had watched police officers gather men for the showup identification, and had recognized Jackson as one of them.

himself from Rowe.[10] The record does not reveal whether a photograph of Rowe was contained in any of the photographic arrays viewed by Brady. Rowe later died, an apparent murder victim.

We now describe the circumstances in which Brady identified the defendant as the unmasked intruder. In the days following the crimes, Brady did not suggest to anyone, including the police, that the defendant (whom she knew) was the unmasked accomplice. At some point she learned that James Brown had been arrested as the masked shooter on September 2. On either September 4 or 5, Brady spoke with her cousin "DJ" about the murder. Brady, now aware that Brown had been arrested for the crime, asked DJ who "h[u]ng[] around" with Brown. DJ named five different men. Brady recognized one name as the defendant. Brady knew the defendant from junior high school and from growing up on the same street with him, and the defendant and one of Brady's cousins were parents of a child. According to Brady, on hearing about the defendant from her cousin, she recalled his appearance and concluded that he was the unmasked accomplice. It is undisputed that, until her cousin linked the defendant to the arrested suspect James Brown, Brady had not identified the defendant as the unmasked accomplice.

Brady withheld her conclusion from the police for nearly two months. Then on October 28, Brady was called to give testimony in the grand jury proceedings concerning James Brown, later indicted as the masked assailant. At the court house, Brady informed the prosecutor for the first time that she "thought" she "knew" the identity of the unmasked accomplice.[11] On November 10, she selected a photograph of the defendant from an array. The following day, the police showed the same photographic array to each of Brady's daughters. Although each had observed the unmasked intruder for a considerable period while he was standing in their

---

[10]Brady's trial testimony accorded with her statement to the police that Rowe and the victim had been friends, but had fallen out some months earlier concerning a financial transaction.

[11]Between concluding that the defendant was the unmasked assailant and so informing the police, Brady learned from her sister that the defendant had been arrested on an unrelated Federal charge.

bedroom, neither of them identified the defendant from the photographic array.[12]

d. *Pretrial discovery requests.* We turn now to the defendant's pretrial discovery requests. On January 20, 1999, the defendant filed a general motion for exculpatory evidence, which apparently was allowed.[13] Then on May 10, 1999, he moved for discovery "concerning the death of Wayne Rowe," the man whom Brady had identified as being the only person who "had a problem" with the victim.[14] The following day a judge in the Superior Court denied the motion in substantial part,[15] ordering only that the Commonwealth disclose to the defendant the caliber of the bullet involved in the Rowe shooting.[16]

e. *Posttrial discovery request.* On November 19, 1999, Julian Thompson was indicted for the murder of Rowe, but he died of cancer before his trial. Some time after the defendant's conviction (the record is not clear as to the precise date), counsel for Thompson forwarded to the defendant's counsel a statement made by a man named Delroy Williams to the police investigat-

---

[12]Tara Woods, a friend of the defendant, testified at trial that she was sitting in a parked car in front of Brady's apartment building at the time of the murder. Woods heard a gunshot, and then saw two men run out of the front door of the building. The first man was dark-skinned and of medium build, with hair that looked like braids or "dreads." The second man was light-skinned. Woods testified that she was "certain" that the second man was not the defendant.

[13]There is nothing on the docket to reflect any ruling on the motion. The docket and a handwritten notation on the motion state, "See record."

[14]Defense counsel sought disclosure of "[a]ll statements of persons concerning Mr. Rowe," "[a]ll police reports concerning the . . . investigation of his death," and "[a]ll ballistics evidence related to the investigation of the death of Mr. Rowe," among other materials. In support of his motion, the defendant noted that Brady had informed the police of the falling out between Rowe and the victim, and argued that the Rowe murder might have been retaliation for the victim's death. He also claimed that "there is a substantial probability that details of Mr. Rowe's death may yield material and exculpatory information concerning the death of [the victim]."

[15]The docket does not reflect any written opposition from the Commonwealth or that any hearing was held on the motion. The "Clerk's Log" in this case reflects that a hearing took place on the day the judge issued his order, but it does not identify the substance of the hearing.

[16]On May 14, 1999, the Commonwealth filed a written response to the judge's ruling to the effect that "the caliber of the ballistics evidence recovered in connection with the Wayne Rowe investigation is not the same caliber as was recovered in connection with [the victim's] homicide."

ing the Rowe murder.[17] Williams's comprehensive, signed statement had been taken by police on May 18, 1999, fifteen months before the defendant's trial began. Williams's signed statement implicated Thompson (while he was still alive), not James Brown, as the masked assailant in the murder of the victim in this case.[18] Williams said that Thompson and Rowe were good friends, and that Rowe and the victim had become hostile to each other.[19] In support of the defendant's posttrial motion, trial counsel submitted an affidavit to the effect that had he received Williams's statement from the Commonwealth as he had requested before trial, he "certainly" would have made an effort to interview Williams.[20] Based on this "newly discovered" evidence,[21] the defendant moved for postconviction discovery of exculpatory evidence, identifying specifically all police or investigative reports and all interviews or statements connected with the Rowe murder investigation. He simultaneously moved for a new trial, arguing that he had recently become aware that the Commonwealth had "intentionally withheld" exculpatory evidence that would have materially aided his defense at trial.

---

[17]Williams made the statement to an Agawam detective and a State trooper.

[18]Williams's statement mentioned ten "Jamaican friends" in Springfield by name, and described some of their involvement with the drug trade in Springfield. James Brown's name was not among them. At the time of Williams's statement, Brown had not yet been acquitted of charges related to the events at issue in this case.

[19]Describing the many ways in which Rowe was connected to the Springfield illicit drug-selling community, Williams informed the police that he had known Rowe "since 1995," when he had met Rowe with the victim. Rowe and the victim, he said, "would always hustle around together" and sold crack at the Red Lion Café in Springfield. Asked to identify who might have murdered Rowe, Williams linked Rowe's killing directly to the victim's murder. He explained that Rowe and the victim were "ex-friend[s]" because, Rowe claimed, the victim had engineered a robbery at Rowe's home. That robbery, Williams continued, was "around five or four months" before the victim "was murdered on Quincy Street." He then explained: "That's the one people said Julian [Thompson] did." He also told the police about the relationship between Rowe and Thompson: "[Rowe] and [Thompson] are good friends. They would rob people together for cash and drugs."

[20]Police officers investigating the victim's murder did not compare Thompson's fingerprints with those found in the victim's apartment. Nothing in the record suggests that the police ever pursued an inquiry of Thompson as the possible masked shooter in the victim's murder.

[21]The motion judge concluded that Williams's statement was newly discovered evidence, a ruling not challenged by the Commonwealth.

The motion judge, who was also the trial judge, denied both motions without a hearing.

2. *Discussion.* The defendant claims that his lack of access to Williams's statement deprived him of the opportunity to introduce exculpatory evidence at trial, in violation of his State and Federal due process rights. We agree.

It is clear that Brady's identification of the defendant as the unmasked assailant was prompted by her assumption that James Brown was the masked shooter. James Brown was acquitted of any involvement in the events leading to the victim's death. Williams's statement links a different individual (Thompson) to the murder, and Williams's statement suggests that Thompson may have had a motive to harm the victim. It takes no stretch of the imagination to understand that had this information been available to the defendant at trial, its exculpatory value would have been considerable. In these circumstances, as we now explain, the judge in the Superior Court (who was not the trial judge) should not have denied the defendant's specific pretrial discovery request; the Commonwealth had a continuing obligation to review the investigative materials concerning Rowe's death requested by counsel and to furnish to defense counsel any favorable information contained therein notwithstanding the denial of the pretrial discovery motion; and the motion for post-trial discovery should have been allowed. We first review the pretrial motion for specific discovery.

"Due process of law requires that the government disclose to a criminal defendant favorable evidence in its possession that could materially aid the defense against the pending charges." *Commonwealth* v. *Tucceri*, 412 Mass. 401, 404-405 (1992), citing *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). The public's faith in the integrity of our criminal justice system could not be sustained otherwise. "Favorable evidence" need not be dispositive evidence. Evidence may be favorable or exculpatory, and thus required to be disclosed, "although it is not absolutely destructive of the Commonwealth's case or highly demonstrative of the defendant's innocence." *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 (1978). If evidence "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although

not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness," that evidence should reach the defendant's hands before trial, if at all possible. *Id.*

We recognize that the question whether such evidence must be disclosed often will involve a judicial determination. At the pretrial stage, and where the requested discovery is specific, the requirements of due process mandate that a judge should not refuse to order discovery without either reviewing the specifically requested material or obtaining a representation from the Commonwealth that the specifically requested material contains no favorable evidence. See *Commonwealth* v. *Tucceri, supra* at 407 ("Judges . . . should be sensitive to the allowance of motions for the disclosure of specific information claimed to be exculpatory"); *Commonwealth* v. *Campbell,* 378 Mass. 680, 700-701 (1979) ("The judge plainly had the responsibility to review and pass on the propriety of any editing of the record of [an interview with the key prosecution witness] rather than to delegate that job entirely to the prosecutor"). This is so because "[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files"; rather, "it is the State that decides which information must be disclosed." *Pennsylvania* v. *Ritchie,* 480 U.S. 39, 59 (1987). If the State decides that information is to be disclosed, the State must review specifically requested information and determine whether it is favorable to the defendant.

Turning to the Commonwealth's duty to disclose, we do not accept the prosecutor's contention that in the circumstances of this case, the denial of the defendant's pretrial discovery request absolved the Commonwealth of its obligation to disclose the specific materials requested. As we explain below, once the Commonwealth has notice that the defendant seeks specific favorable information in the its possession, it must examine the material and furnish that information to the defense if it is favorable. Where the Commonwealth knows that a judge has not reviewed the specifically requested material, its obligation continues.

We have recognized that "prosecutors, who are agents of the

State and often have access to information that defendants may not have, should be encouraged to disclose exculpatory evidence that in fairness defendants should have for their defense." *Commonwealth* v. *Tucceri, supra* at 406. Williams's statement is favorable to the defense precisely because Brady identified the defendant as the unmasked intruder only because of her assumption that Brown, not Thompson, was the masked shooter. Without Williams's statement, the defendant was denied a "substantial factual basis for contending to the jury that [a witness] misidentified him." *Id.* at 413. Thompson's counsel of course recognized the importance of Williams's statement to the defendant's case, which is why he forwarded it to defense counsel. The Commonwealth should have done the same once it had been put on actual notice by defense counsel of the request for specific favorable evidence.[22] See, e.g., *United States* v. *Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992) ("Where . . . there is an explicit request for an apparently very easy examination, and a non-trivial prospect that the examination might yield material exculpatory information," prosecution has obligation to search possible sources for such information, including files of another agency). See also *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Cf. *Commonwealth* v. *Donahue*, 396 Mass. 590, 596-599 (1986) (in some circumstances, prosecutor "should be required to seek access to material and exculpatory evidence" not in possession of prosecutor or police).

Due process does not require "prosecutorial clairvoyance." *Commonwealth* v. *Wilson*, 381 Mass. 90, 109 (1980). It does, however, require continued vigilance on the part of the Com-

---

[22]There is no claim here, nor is there any evidence in the record, that the Commonwealth did not furnish the evidence from the Rowe investigation to defense counsel under improper motives. Nor are we suggesting that the Commonwealth suppressed Williams's statement. "[T]he constitutional obligation is [not] measured by the moral culpability, or the willfulness, of the prosecutor." *Commonwealth* v. *Ellison*, 376 Mass. 1, 24 n.14 (1978), quoting *United States* v. *Agurs*, 427 U.S. 97, 110 (1976). The "overriding concern" in evaluating whether evidence should have been disclosed is "with the justice of the finding of guilt." *United States* v. *Agurs, supra* at 112.

monwealth for information the Commonwealth knows, or should know, the defendant seeks as material to his defense. In the circumstances of this case, the Commonwealth had a continuing duty to review the materials specifically requested by the defendant and to disclose any favorable evidence found in those materials. "[I]t is highly relevant that defense counsel pinpointed files that [could] be searched without difficulty." *United States* v. *Brooks, supra* at 1503.

Our discussion of the judge's responsibilities and the Commonwealth's duty to disclose informs our discussion of the denial of the posttrial motions for a new trial and for discovery. We begin with the standard of review. When the Commonwealth withholds evidence that has been *specifically* requested, we review the matter under a standard for allowing a motion for a new trial that is "more favorable to the defendant" than if the request had been general "in order to motivate prosecutors to be alert to defendants' rights to disclosure." *Commonwealth* v. *Tucceri, supra* at 407.[23] Because defense counsel is more likely to treat the prosecutor's failure to disclose specifically requested material as an implied representation that the evidence does not exist and make legal and strategic decisions accordingly, when the Commonwealth has not disclosed specifically requested favorable evidence, the defendant "need only demonstrate that

[23]Depending on the specificity of the defendant's request for exculpatory evidence, we apply different standards of review for determining whether the prejudice to the defendant warrants the granting of a new trial. See *Commonwealth* v. *Gallarelli,* 399 Mass. 17, 21 n.5 (1987) (declining to adopt one single test for materiality that covers "no request," "general request," and "specific request" cases of prosecutorial failure to disclose exculpatory evidence, and adhering to "the more prudent safeguards of defendants' rights" found in State law decisions). Where the defendant has made only a general request for exculpatory evidence, we "require[] a careful review of the trial court proceedings to determine whether there is a substantial chance that the jury might not have reached verdicts of guilty if the undisclosed evidence had been introduced in evidence." *Commonwealth* v. *Tucceri,* 412 Mass. 401, 413 (1992).

For a request to be considered "sufficiently specific to place the prosecution on notice as to what the defense desires," it must "provide the Commonwealth with notice of the defendants' interest in a particular piece of evidence," *Commonwealth* v. *Wilson,* 381 Mass. 90, 108-109 (1980). The defendant's request for "[a]ll statements of persons concerning Mr. Rowe" and "[a]ll police reports concerning the recovery of Mr. Rowe's body and/or the investigation of his death" clearly does so.

a substantial basis exists for claiming prejudice from the nondisclosure." *Id.* at 412.

Defense counsel conceded at oral argument that the judge properly denied the defendant's motion for a new trial, but presses his claim for discovery and a hearing on a motion for a new trial.[24] We conclude that the judge should have granted the defendant's request for postconviction discovery and that a hearing on his motion for a new trial may be warranted.

Rule 30 (c) of the Massachusetts Rules of Criminal Procedure delineates specific procedures for postconviction motions for a new trial and gives the judge discretion in holding a hearing on the motion and in granting posttrial discovery.[25] Where the affidavits[26] accompanying the motion for a new trial establish "a prima facie case for relief," the judge "may authorize such

---

[24]Counsel stated: "I think certainly [Williams's statement] warrants some follow-up. And I think based on this information, I don't think we get a new trial. But I think what we do get is a hearing on a motion for a new trial and I think we get discovery."

[25]Rule 30 of the Massachusetts Rules of Criminal Procedure, as appearing in 435 Mass. 1501 (2001), states in pertinent part:

"(c) Post Conviction Procedure. . . . (3) Affidavits. Moving parties shall file and serve and parties opposing a motion may file and serve affidavits where appropriate in support of their respective positions. The judge may rule on the issue or issues presented by such motion on the basis of the facts alleged in the affidavits without further hearing if no substantial issue is raised by motion or affidavits.

"(4) Discovery. Where affidavits filed by the moving party under subdivision (c)(3) establish a prima facie case for relief, the judge on motion of any party, after notice to the opposing party and an opportunity to be heard, may authorize such discovery as is deemed appropriate, subject to appropriate protective order."

[26]The Commonwealth points out that the defendant only presented Williams's signed police statement and not an affidavit, as required by rule 30 (c) (3). See *Commonwealth* v. *Francis*, 432 Mass. 353, 372-373 (2000) (affirming denial of motion for new trial where motion judge ruled that signed statements to private investigator "did not comply with Mass. R. Crim. P. 30 (c) (3)," because they were not sworn affidavits; statements "had no corroborating circumstances or other indicia of trustworthiness" and were inadmissible hearsay; and "numerous factual discrepancies rendered them inherently unreliable"; "[e]ach of these reasons independently constitutes a sufficient basis for the judge's denial of the defendant's motion for a new trial").

Even though affidavits are preferable, signed police statements with sufficient indicia of reliability and other corroborating circumstances may, in

discovery as is deemed appropriate." Mass R. Crim. P. 30 (c) (4). The term "prima facie case" traditionally has had two connotations: it may be equivalent to a presumption, or it may mean the sufficiency of evidence to go to the jury. 9 J. Wigmore, Evidence § 2494 (Chadbourn rev. ed. 1981).[27] The Reporters' Notes make clear that the latter definition applies in the rule 30 postconviction discovery context. See Reporters' Notes to Mass. R. Crim. P. 30, Mass. Ann. Laws, Rules of Criminal Procedure, at 1512 (LexisNexis 2004). Indeed, if a defendant were expected to present enough evidence through affidavits justifying the presumption that he was entitled to a new trial, postconviction discovery would serve no purpose. The purpose of postconviction discovery is to allow a defendant to gather evidence to support "an apparently meritorious claim . . . [where] the evidence that can be adduced to support the claim is unknown to the court."

---

some circumstances, be sufficient evidence to raise a substantial issue warranting a hearing on the motion, or to order discovery. See *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348 (2004) ("A defendant's submissions in support of a motion for a new trial need not prove the factual premise of that motion . . . but they must contain sufficient credible information to 'cast doubt on' the issue" [citation omitted]); *Commonwealth* v. *Colantonio*, 31 Mass. App. Ct. 299, 301-302 & n.3 (1991), quoting *Commonwealth* v. *Grace*, 397 Mass. 303, 306 (1986) (motion judge did not dismiss motion for new trial solely because it was accompanied by police statement and not affidavit; judge reviewed codefendant's police statement and determined that potential testimony of codefendant would not have been "a real factor in the jury's deliberations," where statement contained some information corroborating defendant's claim of defense of another but also contained inculpatory information).

In our view, Williams's signed police statement contained sufficient indicia of reliability to support the defendant's motion. Williams's statement revealed that Williams was well informed of the relationships among Springfield drug dealers, and his statement concerning the specific relationship between Rowe and the victim was further corroborated by Brady's testimony. We also fail to see how, several years after trial and without funds for an investigator, the defendant could be expected to produce an affidavit by Williams in support of his rule 30 motion.

[27]Professor Wigmore notes that the "presumption" definition goes beyond the "sufficiency of evidence" definition: "the proponent, having the burden of proving the issue . . . has not only removed by sufficient evidence the duty of producing evidence to get past the judge to the jury, but has gone further, and, either by means of a presumption or by a general mass of strong evidence, has entitled himself to a ruling that the opponent should fail if he does nothing more in the way of producing evidence." 9 J. Wigmore, Evidence § 2494 (Chadbourn rev. ed. 1981).

4 ABA Standards for Criminal Justice, Postconviction Remedies Commentary to Standard 22-4.5, at 22-48 (2d ed. 1986). In requesting such discovery, the defendant must make a sufficient showing that the discovery is reasonably likely to uncover evidence that might warrant granting a new trial. See Reporters' Notes, *supra* ("Discovery is appropriate where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he or she is entitled to relief").

To meet the prima facie case standard for discovery under a motion for a new trial based on newly discovered evidence, a defendant must make specific, not speculative or conclusory, allegations that the newly discovered evidence would have "materially aid[ed] the defense against the pending charges," *Commonwealth* v. *Tucceri*, 412 Mass. 401, 405 (1992), and that this evidence, if explored further through discovery, could yield evidence that might have "played an important role in the jury's deliberations and conclusions, even though it is not certain that the evidence would have produced a verdict of not guilty." *Id.* at 414. See Reporters' Notes, *supra*.[28]

The defendant established a prima facie case for posttrial discovery. Brady's identification was the peg on which the defendant's conviction hung or fell. The strength of that identification might have been considerably lessened at trial,

---

[28]In cases where we have affirmed denials of postconviction discovery, the evidence against the defendant has been substantial, if not overwhelming. See, e.g., *Commonwealth* v. *Martinez*, 437 Mass. 84, 87 (2002) (affirming denial of postconviction discovery where claimed newly discovered evidence was tape recording of victim's boy friend's confession to killing, but where police officers had investigated lead, boy friend denied everything, and police determined that tape recording contained no discussion of murder; among other evidence against defendant, one witness had encountered defendant with bloody knife on day following murder and, when asked for explanation, defendant had responded that he "had slashed a bitch"); *Commonwealth* v. *Tague*, 434 Mass. 510, 517, 519 (2001) (defendant did not establish prima facie case for relief warranting postconviction discovery where discovery sought — accomplice's clothing for purpose of testing it for presence of victim's blood — "would not exculpate the defendant," and where Commonwealth's case against defendant was "overwhelming," in part because "[g]iven the defendant's admission to [a friend] that he stabbed [the victim], the jury easily could have concluded that both [the defendant and the accomplice] stabbed [the victim]").

even shattered, by evidence pointing to a culprit who was not a friend of the defendant and may have been hostile to him — provided that Williams's statement led to such evidence.[29] Williams's statement suggests a plausible theory that Thompson killed the victim at Rowe's behest.[30] This theory matched precisely defense counsel's theory that Rowe was involved in the victim's murder and had a motive for killing the victim.[31] The statement as a whole also shows that Williams was highly knowledgeable about the relationships among drug dealers in Springfield, a group that included the victim, Thompson, and Rowe. It is not difficult to credit trial counsel's affidavit that he "certainly" would have made an effort to interview Williams

---

[29]It is significant that the judge allowed the testimony of an expert in the field of eyewitness identification because of the unique circumstances in which Brady, the sole eyewitness, made her identification of the defendant. The judge explained during voir dire of the expert:

> "Ms. Brady's identification of the defendant in this case is a little different than in many circumstances. . . . According to her testimony, it came to her some days later that the unmasked perpetrator was or might have been this defendant based on some conversations she had with nonpolice persons. And clearly the undisputed evidence is that she does not report her decision that the unmasked person was this defendant to law enforcement authorities for, I believe, four to six weeks . . . . So there is that gap between when she first makes statements to the police and when she later reports to the police her identification of the defendant as the unmasked assailant."

Dr. Alexander Daniel Yarmey, an expert in eyewitness identifications, testified for the defense that stress can negatively affect memory acquisition, that the postevent period can alter memory, and that an eyewitness's perceptions are influenced by what she expects to see. He further testified that "[o]ther materials, such as talking to other persons, being introduced to other information, can override original cues such that introduction of new materials now result in the fact that the memory trace is altered by the fact of having talked with, having explored, having been introduced to other kinds of evidence."

[30]Immediately before shooting the victim, the masked intruder told Brady to tell the victim that "this is payback."

[31]Williams's statement to the police, which was not disclosed to the defendant, contained three key points: (1) Rowe and Thompson were "good friends" who together robbed people for cash and drugs; (2) Rowe and the victim had had a falling out; and (3) Williams identified Thompson as the person "people say" killed the victim. Although the Commonwealth urges us to focus on the phrase "people say" and to discount the value of Williams's statement to the defense, we are not free to ignore the impact of the statement as a whole.

had he known of the statement, and to pursue the various leads contained in the statement.[32] Any competent counsel would have done as much in the circumstances. That is precisely what counsel informed the motion judge he intended to do. Contrast *Commonwealth* v. *Healy*, 438 Mass. 672, 683 (2003), citing *Commonwealth* v. *Tucceri*, *supra* at 410 ("We are not confronted with a situation where an argument made at trial could have been made more forcefully if defense counsel had had the withheld evidence"); *Commonwealth* v. *Martinez*, 437 Mass. 84, 97 (2002) (postconviction discovery denied where police already conducted "extensive discovery" of newly discovered evidence and this discovery was already "voluntarily supplied" by district attorney). At trial the defendant elicited testimony from Brady that Rowe was the victim's enemy and that Brady had identified Jackson's voice as that of the masked shooter. However, the defendant was unable to provide further evidence to support his theory that some other specific person could have been the masked shooter.[33]

Our ruling in this case does not mean that files relating to other investigations must routinely be disclosed to a defendant upon request. See *United States* v. *Joseph*, 996 F.2d 36, 41 (3d Cir. 1993) ("We will not interpret *Brady* to require prosecutors to search their unrelated files to exclude the possibility, however remote, that they contain exculpatory information"). But where the material has been specifically requested by the defendant and the defendant has made a showing that the material appears to be relevant to his defense (here, Brady's identification of Wayne Rowe as the one person with whom the defendant "had

---

[32]The Commonwealth argues that the statement implicating a different masked shooter ("people say") was inadmissible hearsay. But the test for postconviction discovery is not whether the statement was admissible but whether it might have "materially aid[ed] the defense" at trial, *Commonwealth* v. *Tucceri*, *supra* at 405, and might have led to the discovery of admissible evidence.

[33]The Commonwealth argues that defense counsel presented evidence that implicated Chandler and Carey Spence. Brady did testify that she told police that the man at the door said he was Chandler, that she still did not know if it was Chandler, and that Chandler and Spence were both drug dealers. But Brady was clear in her testimony before the jury that Chandler and Spence remained friends of the victim, suggesting that neither Chandler nor Spence had reason to kill the victim.

a problem"), the Commonwealth has a continuing duty to review the material and to disclose to the defendant any "favorable evidence in its possession that could materially aid the defense against the pending charges." *Commonwealth* v. *Tucceri, supra* at 405. Cf. *Commonwealth* v. *Dew*, 443 Mass. 620, 627 (2005) (concerning defendant's right to introduce evidence of similar crime committed by another). This is one of the rare cases where we cannot say that the evidence was "reasonably discoverable by [the defense] at the time of trial," *Commonwealth* v. *Grace*, 397 Mass. 303, 306 (1986), as the judge recognized. See note 21, *supra*. It is also one of the rare cases that, for the reasons we have discussed, leaves us with the conviction that "justice may not have been done." Mass. R. Crim. P. 30 (b).

3. *Relief pursuant to G. L. c. 278, § 33E.* In light of our disposition of the defendant's posttrial discovery motion it is not necessary to dispose of his claim for relief under G. L. c. 278, § 33E, at this time. We need not speculate about how the jury may have weighed any evidence that could have been derived from Williams's statement.

4. *Conclusion.* Williams's statement and the affidavit from the defendant's trial counsel established a "prima facie case for relief," Mass. R. Crim. P. 30 (c) (4), and postconviction discovery should have been allowed. If, on further investigation of Williams's statement, as well as all of the other Rowe murder investigation materials,[34] the defendant is able to raise a "substantial issue," Mass. R. Crim. P. 30 (c) (3), he may file a motion for a hearing on and a renewed motion for a new trial. The defendant may file a motion for costs for the preparation and presentation of such a motion. Mass. R. Crim. P. 30 (c) (5). We remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[34]See note 14 and discussion at Part 1.d, *supra*. In his motion for postconviction discovery, the defendant requested "[a]ll police or investigative reports, [a]ll reports of scientific testing, [a]ll interviews or statements, and any other exculpatory or potentially exculpatory evidence in the Commonwealth's possession in connection with the Rowe murder investigation."